**In re Arthur Nicholas HOSKING, III, Debtor.**

**AMERICAN INVESTMENT BANK, N.A. Plaintiff,**

v.

**Arthur Nicholas HOSKING, III, Defendant.**

**Bankruptcy No. 87–01733–BKC–AJC. Adv. No. 87–0392–BKC–AJC–A.**

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

June 20, 1988.

Mark J. Wolfson, Rudnick & Wolfe, Tampa, Fla., for America Inv. Bank, N.A.

Arthur Nicholas Hosking, III, Ft. Lauderdale, Fla., and Pompano Beach, Fla., pro se.

Milton G. Friedman, Ft. Lauderdale, Fla., Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. JAY CRISTOL, Bankruptcy Judge.

THIS MATTER was tried before the Court on April 21 and June 24, 1988, upon the Complaint to Determine Dischargeability of Debt and for Entry of Final Judgment of Damages filed by Plaintiff, American Investment Bank, N.A. ("AIB") against the Debtor, Arthur Nicholas Hosking, III ("Hosking"). Having reviewed the evidence, having observed the demeanor of witnesses, having heard argument of the parties, and having been otherwise advised in the premises, the Court makes the following Findings of Fact and Conclusions of Law:

### PROCEDURAL BACKGROUND

1. On May 19, 1987, Hosking filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code. On August 24, 1987, AIB filed a Complaint to Determine Dischargeability of Debt and for Entry of Final Judgment of Damages (the "Complaint") against Hosking. The Complaint sought to preclude dischargeability of the debt owed by Hosking to AIB pursuant to Sections 523(a)(2)(A) and (B) of the Bankruptcy Code. At trial, AIB abandoned the Section 523(a)(2)(A) claim and did not present any evidence in support of that claim.

### JURISDICTION

2. AIB's claim pursuant to Section 523(a)(2)(B) of the Bankruptcy Code is a "core" proceeding and, therefore, this Court has jurisdiction pursuant to 28 U.S.C. Sections 157 and 1334.

### RELEVANT FACTS

3. AIB is a national banking association located in Salt Lake City, Utah, which makes unsecured loans to executive and professional individuals throughout the United States by mail. Hosking is a resident of Broward County, Florida, and a professional architect with significant experience in real estate development, real estate brokerage and interior design businesses.

4. For several years prior to October 1985, Hosking operated an architect practice, development business, interior design business, and real estate brokerage company through separate corporations.

5. Sometime during 1982, Raymond Levinson ("Levinson") recommenced being Hosking's financial advisor and Edwin Tunick ("Tunick") acted as Hosking's professional accountant. Tunick was the sole shareholder of Edwin Tunick, C.P.A., P.A. Levinson worked as a staff accountant and financial planner through Tunick's office at this time. Hosking knew Levinson for many years prior to 1982, and Levinson had provided Hosking with tax advice and financial planning services for several years prior to 1982.

6. Tunick had prepared financial statements for Hosking during 1983 and 1984 at Hosking's request for purposes of submitting loan applications to various banks. At least two of the 1984 financial statements prepared by Tunick were presented to and signed by Hosking without his reviewing them. Both Hosking and Tunick's office submitted financial statements prepared by Tunick prior to 1985 to various banks.

7. Sometime in 1985, Hosking advised Levinson and Tunick that he anticipated a substantial increase in his income because of real estate development and architect services contracts which he had signed on behalf of two of his corporations. At or about the same time, Tunick and Levinson suggested that Hosking invest in an oil drilling limited partnership as a tax shelter.

Hosking told Levinson and Tunick that he did not have cash available to invest in the limited partnership, but Hosking was informed by Levinson and Tunick that a Utah bank might provide financing to investors who could qualify as borrowers, including him.

8. Sometime during October 1985, Hosking agreed to purchase a unit in the limited partnership and authorized Levinson and Tunick to do what was necessary to get him into the limited partnership, including obtaining a loan on his behalf to pay for the investment. Hosking was told by Levinson and Tunick that submission of a loan application and financial statement to the Utah bank was part of the process in obtaining an interest in the limited partnership. Hosking knew Levinson and/or Tunick would make an application to the bank on his behalf in order to obtain funds to pay for Hosking's investment in the limited partnership.

9. In October 1985, Tunick filled out an AIB Personal Financial Statement and Consumer Loan Application (the "Financial Statement") for Hosking. Tunick completed the Financial Statement based upon information obtained from Hosking's 1984 financial statements, discussions with Levinson and speaking with Hosking regarding the changes in his financial condition since his last financial statement was prepared. Prior to submitting Hosking's Financial Statement to AIB, Tunick advised AIB officials that his office did Hosking's tax work.

10. Although Hosking testified that he did not sign the Financial Statement, AIB's expert testified to a reasonable degree of scientific certainty that Hosking signed the Financial Statement on the bottom of the last page. Tunick testified the Financial Statement was delivered to Hosking for signature and later returned to his office with a signature at the bottom of the last page. Charles M. Mathis, Jr. ("Mathis") of AIB testified Hosking admitted, during a trip Mathis made to Ft. Lauderdale after Hosking became delinquent in his payments, that he signed the Financial Statement without reading it after it was prepared by his accountants.

11. Tunick and/or Levinson sent Hosking's completed Financial Statement and copies of what was purported to be Hosking's 1983 and 1984 personal income tax returns to AIB during October 1985.

12. Based upon Hosking's Financial Statement and copies of the tax returns, AIB tentatively approved a loan to Hosking in the principal amount of $32,000.00. However, before final approval of the loan and disbursement of the loan proceeds check, AIB wanted a further breakdown of the $245,000.00 value placed on Hosking's personal property and the $750,000.00 value placed upon his business assets. The Financial Statement was returned to Tunick's office for a breakdown. Tunick added the breakdown based upon information contained in Hosking's 1984 financial statements.

13. Tunick testified he then dropped off the Financial Statement with the breakdowns at Mr. Hosking's office, which was later returned to his office with each breakdown initialed (purportedly by Hosking). Hosking denied initialing the breakdown, and AIB's expert acknowledged to the Court that the initials underneath the two breakdowns were not Hosking's. In any event, neither of the breakdowns changed total values originally provided on the Financial Statement. The Financial Statement was then returned to AIB by Tunick's office.

14. On or about October 25, 1985, Kenneth W. Harris ("Harris") of AIB sent a letter to Tunick's office or directly to Hosking stating that AIB was not involved in any investment Hosking might be making with the loan proceeds to be sent by AIB and that Hosking understood that the loan was based solely upon his loan application, credit history and other financial information provided to AIB. The first sentence of the second paragraph of that letter states: "Our loan to you is made based solely upon the financial and other information you provided to us together with your credit history and loan application and is made independent of whether or not you make any type of investment with any Promoter".

15. Hosking admits that he signed the October 25, 1985 letter, which was returned to AIB prior to disbursement of the loan proceeds check. Hosking also admits that he signed the AIB Truth-in-Lending Disclosure Statement and State Contract Disclosures Document (the "Promissory Note"), which he gave to Tunick or Levinson who returned it to AIB before disbursement of the loan proceeds check.

16. On November 5, 1985, Harris telephoned Hosking's home or office but Hosking was not available. Harris left a message for Hosking to return the call to him at AIB in Utah. On November 6, 1985, Harris received a telephone call from a man who identified himself as Hosking. During that telephone conversation, Harris went over the loan information, confirmed the loan payments and obtained the understanding that AIB was not involved in any investment which Hosking might be making with the loan proceeds. The Court finds Harris spoke to Hosking.

17. Shortly after the telephone conversation, AIB sent the loan proceeds check made payable to Arthur N. Hosking, III either to Tunick's office or directly to Hosking at his residence. The check had Hosking's resident address printed on it.

18. Tunick testified when he came into the possession of the AIB check, he went to Hosking's office to obtain Hoskings' endorsement to the limited partnership for purposes of depositing the check in the limited partnership's bank account. Tunick further testified Hosking was not in his office at the time and that he had to wait until Hosking returned from lunch to obtain his signature on the check. According to Tunick, he obtained Hosking's signature over an endorsement to the limited partnership and then deposited the proceeds into the limited partnership's bank account. Hosking testified he turned the check over to Tunick without signing it when he received possession of it. Nevertheless, Hosking subsequently became an investor in the limited partnership, and the AIB loan proceeds were used to purchase his investment.

19. At no time prior to the commencement of this proceeding by AIB did Hosking advise AIB or Tunick that he had never made a loan with AIB or submitted the Financial Statement for purposes of obtaining a loan.

20. There is no evidence of any negligence or wrongdoing on the part of AIB regarding the subject loan transaction.

21. Hosking stipulated prior to trial that the Financial Statement contained materially inaccurate and false information regarding his financial condition. Further, Hosking failed in his attempt to rebut the stipulation by introducing evidence of income to be earned in 1985 and beyond by separate corporations which he controlled.

22. Hosking also stipulated prior to trial that AIB reasonably relied upon the materially inaccurate and false Financial Statement in extending the loan to him.

23. Hosking failed to make any payments pursuant to the Promissory Note. AIB is owed the principal sum of $33,420.00 plus accrued interest according to the terms of the Promissory Note.

24. The AIB Promissory Note provides that AIB is entitled to recovery of reasonable attorneys' fees and costs incurred in a proceeding to collect or enforce the debt. AIB has requested attorneys' fees in the amount of $22,935.00 and costs in the amount of $3,099.46. AIB's counsel has submitted its fee and costs invoices, time records, and costs documentation in support of its request.

## CONCLUSIONS OF LAW

1. Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge pursuant to Section 727 of the Bankruptcy Code any debt incurred by an individual through use of a false financial statement. This section specifically provides, *inter alia:*

(a) A discharge under Section 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied, and

(iv) that the debtor caused to be made or published with intent to deceive;

2. The AIB Financial Statement clearly is a writing contemplated by the statute. Further, the first three requirements of Section 523(a)(2)(B) have been established by stipulation of the parties and/or "clear and convincing evidence." Hosking stipulated that the Financial Statement was "materially inaccurate and false" and that AIB "reasonably relied" upon the Financial Statement in extending the loan to him. Obviously, the Financial Statement concerns Hosking's financial condition.

■ 3. The only remaining question which must be answered affirmatively in order to deny Hosking discharge of his debt to AIB is whether AIB has proven by "clear and convincing evidence" that Hosking "caused" the Financial Statement "to be made or published with intent to deceive." Section 523(a)(2)(B)(iv). AIB contends Hosking should not be discharged from the AIB debt because:

(a) Hosking knowingly signed the fraudulent Financial Statement prepared by his agents and authorized his agents to submit the Financial Statement to AIB on his behalf;

(b) Hosking, with "reckless disregard" or "reckless indifference" for the truth, "caused" the Financial Statement to be "made or published" because (i) he signed the Financial Statement without reading it and allowed his agents to submit the fradulent Financial Statement to AIB or, (ii) even if he did not sign or read the Financial Statement, Hosking is responsible for the acts of his agents who prepared and submitted the fraudulent Financial Statement to AIB; or

(c) Even if Hosking did not read or sign the fraudulent Financial Statement prior to or at the time it was submitted to AIB, he subsequently ratified the acts of his agents, who sent the fraudulent Financial Statement to AIB.

4. In defense of AIB's claim, Hosking contends he neither knew about the Financial Statement nor signed it.

5. Although the evidence produced at trial adequately supports the conclusion that Hosking signed the fraudulent Financial Statement without reading it and, therefore, he is not entitled to discharge of the AIB debt,[1] *Walker v. Citizens State Bank of Maryville, Missouri,* 726 F.2d 452, 454 (8th Cir.1984), *on remand,* 53 B.R. 174 (Bankr.W.D.Mo.1985); *In re Coughlin,* 27 B.R. 632 (1st Cir.B.A.P.1983), this Court can reach the same determination based upon the totality of the circumstances, even if Hosking did not actually sign the fraudulent Financial Statement.

■ 6. Assuming Hosking did not actually sign the Financial Statement, the Court concludes he is not entitled to discharge of the AIB debt because his conduct with respect to obtaining a loan in the principal amount of $33,420.37 was so reck-

---

1. The handwriting expert testified Hosking probably signed the Financial Statement. Hosking admitted he signed the October 25, 1985 letter and Promissory Note, which were sent to Tunick's office or Hosking directly, after AIB initially received the Financial Statement. Tunick testified he completed the Financial Statement, had it delivered to Hosking's office, and the Financial Statement was later returned to his office with a signature on the bottom of the last page. Charles Mathis testified Hosking admitted signing the Financial Statement without reading it.

In *Walker,* the Eighth Circuit stated:

In the cases cited to us, the debtors were found to be recklessly indifferent because they had signed false documents without examining them. *Id.; Gardner v. American Century Mortgage Investors,* 577 F.2d 928, 929 (5th Cir.1978); *In re: Santos,* 211 F.2d 887, 889 (7th Cir.1954); *In re: Savarese,* 209 F. 830, 832 (2d Cir.1913). Despite the debtor's lack of actual knowledge, the courts in those cases refused to discharge the debts because the debtors had no reason, good or bad, for their lack of knowledge. In other words, the debtors in those cases should have known of the fraud.

*Id.;* 726 F.2d at 454. The court equated such recklessness with "intent to deceive."

less that it establishes the requisite "intent to deceive." Section 523(a)(2)(B) of the Bankruptcy Code contains "no requirement that a statement in writing concerning the debtor's financial condition be signed." *In re Archangeli,* 6 B.R. 48, 49 (Bankr.D.Me. 1980); *accord In re Shelton,* 42 B.R. 547, 548 (Bankr.E.D.Mo.1984). Additionally, a plaintiff need not establish "intent to deceive" by direct proof because the court may infer such intent from the facts and circumstances surrounding a debtor's conduct. *European American Bank v. Gitelman,* 74 B.R. 492, 497 (Bankr.S.D.Fla. 1987); *Matter of Bonanza Import & Export, Inc.,* 43 B.R. 570, 575 (Bankr.S.D.Fla. 1984). Further, the Eleventh Circuit has held that the "intent to deceive" element of a Section 523(a)(2)(B) claim is established by proof of the debtor's "reckless disregard" or "reckless indifference" to the truth. *Birmingham Trust National Bank v. Case,* 755 F.2d 1474, 1476 (11th Cir.1985); *In re Stivers,* 84 B.R. 852, 854 (Bankr.S.D.Fla.1988); *Accord Walker.*

7. This Court concludes that AIB has proven by "clear and convincing evidence" that Hosking caused the fraudulent Financial Statement "to be made or published with intent to deceive" because that evidence proves Hosking acted with such reckless disregard for the truth and the acts of his agents whom he authorized to obtain the AIB loan on his behalf. The evidence clearly and convincingly demonstrates that Tunick and Levinson were Hosking's agents with respect to obtaining the AIB loan.

8. In *Walker,* the Eighth Circuit stated the debtor's failure to read a document prepared by his agent before signing it "is not the only kind of act which can constitute 'reckless indifference'." 726 F.2d at 454. The Court held:

> Thus, we agree with the district court that more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. However, as indicated, actual participation in the fraud by the principal is not always required. If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal. When the principal is recklessly indifferent to his agent's acts, it can be inferred that the principal should have known of the fraud.

*Id.* The Court reasoned that the "debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud." *Id.*

9. On the other hand, other bankruptcy courts have imputed the fraud of an agent to the principal-debtor under Section 523(a)(2) of the Bankruptcy Code without requiring proof that the debtor "knew or should have known" of the agent's fraud. *In re Beleau,* 35 B.R. 259 (Bankr.D.R.I. 1983); *In re Lowther,* 32 B.R. 638 (Bankr. W.D.Okla.1983); *In re Shelton,* 28 B.R. 218 (Bankr.E.D.Mo.1983); *In re Newmark,* 20 B.R. 842 (Bankr.E.D.N.Y.1982). *See generally, Collier,* ¶ 523.08 at 523–49, (15th ed.). Florida case law is consistent with this approach. In *Life Insurance Company of North America v. Del Aguila,* 417 So.2d 651 (Fla.1982), where an investor brought an action against an insurance company, the insurance agency, and the insurance agency's employees, the Florida Supreme Court held "a principal is liable for the tortious conduct of his agent, even though not authorized, if the agent was acting within the scope of his employment or apparent authority." *Id.* at 652. *Accord Burnett v. Brito,* 478 So.2d 845, 847 (Fla. 3rd DCA 1985); *Cavic v. Grand Bahama Development Co., Ltd.,* 701 F.2d 879, 885–86 (11th Cir.1983).

10. Another judge of this court, without addressing the agency-principal issue, appears to have adopted the "knew or should have known" requirement when a creditor attempts to impute fraud between spouses. *See In re Shane,* 80 B.R. 240 (Bankr.S.D. Fla.1987). At least in the bankruptcy context, it appears courts require proof of some level of knowledge on the part of the second spouse, actual or constructive, before liability will be imposed upon the spouse not directly involved in the fraudulent conduct. This is a departure from the

established common law of Florida regarding agency and principal liability. The case *sub judice*, however, is not one in which the principal and agent are spouses. Consequently, it is not necessary for this Court to determine whether the standard for imputing fraud from one spouse to another spouse in a dischargeability case applies to the other principal-agency relationships in order to hold a principal liable for the acts of his agent under Section 523(a)(2)(B).

11. Consistent with *In re Newmark*, 20 B.R. 842 (Bankr.E.D.N.Y.1982) and Florida common law, Hosking is responsible for Levinson's or Tunick's submission of the fraudulent Financial Statement to AIB, whether or not he knew or should have known of their fraud. Under this "strict liability" theory, a plaintiff need prove only that the agent was acting within the scope of his employment or apparent authority to succeed on a dischargeability claim. Again, Hosking engaged Tunick and Levinson as his accountants and financial advisors for several years prior to the AIB loan and specifically authorized them to get him into the limited partnership investment and obtain a loan on his behalf to finance that investment.

12. Even if the "knowledge" standard announced in *Walker* and apparently adopted in *Shane* is applied to this case, AIB at least has proven by "clear and convincing evidence" that Hosking "should have known" of his agents' fraud in preparing and submitting the Financial Statement to AIB. As emphasized by the Eighth Circuit in *Walker*, the "intent to deceive" will be inferred when a principal "is recklessly indifferent to his agent's acts," 726 F.2d at 454. There is an abundance of evidence in the present case which enables this Court to conclude that Hosking's conduct with respect to the AIB loan was sufficiently "reckless" so as to preclude his discharge from that particular debt.[2] For example, Hosking authorized Levinson and Tunick to obtain a loan on his behalf so that he could finance his investment in the limited partnership; he knew a loan application and Financial Statement would have to be submitted sometime before obtaining a loan to finance his investment; he discussed with Levinson and Tunick his financial condition before the Financial Statement was prepared; he signed the Promissory Note without reading it and gave it back to Tunick or Levinson; he signed the October 25, 1985 letter acknowledging that AIB was making him a loan based upon a loan application and his financial status; he spoke with Harris of AIB prior to disbursement of the loan process; and, accepting Hosking's testimony, he willingly gave to Tunick the AIB check in the amount of $32,000.00 made payable to him alone. The check was endorsed by Hosking or someone else and deposited into the limited partnership bank account. Hosking's investment was paid for with the AIB loan proceeds.

13. Based upon the facts recited above, the fact that Hosking is an intelligent and experienced businessman and the totality of the circumstances, this Court is easily convinced that Hosking abandoned his responsibility as a loan applicant to his agents and paid no attention to their activities. Hosking's actions and omissions satisfy the "recklessness" test. *Case; Walker*. This Court concludes AIB has proven by "clear and convincing evidence" the last element of a Section 523(a)(2)(B) claim necessary to exclude a debt from dischargeability.[3] Moreover, this Court is not convinced that Hosking did not have some actual knowledge of his agent's activities.

14. There is also some merit to AIB's contention that Hosking ratified the fraud

---

2. Hosking's "reckless" conduct in this case is not inconsistent with his abdication of responsibility evidenced in 1984. Hosking authorized Tunick to prepare financial statements during 1984, which he signed without reading and then submitted to different banks for the purpose of obtaining loans.

3. The fact that the Financial Statement was returned to Tunick's office by AIB for a breakdown of certain assets does not alter this result. The addition of the breakdown by Tunick did not change the original fraudulent total value inserted therein originally. Further, the October 25, 1985 letter was signed by Hosking after the Financial Statement, as clarified, was resubmitted by his agents.

of his agents, assuming that he was unaware that the fraudulent Financial Statement had been submitted to AIB. In *Matter of Mickler*, 50 B.R. 818 (Bankr.M.D.Fla. 1985), Judge Paskay, applying Florida common law, explained:

> However, the law is clear that the binding effect of an agent's acts is not necessarily dependent upon the existence of the authority at the time the act was performed. Rather, acts which are performed outside the scope of an agent's authority, or which are performed outside the scope of an agent's authority, or which are performed by one who is not even an agent may be ratified by the principal. *Armstrong v. Blackadar*, 118 So.2d 854 (Fla. 2nd DCA 1960).

> Ratification of acts, either outside the scope of the agency or performed by one who purports to be an agent, may be express or implied. *Croom v. Swann*, 1 Fla. 211 (1847). However, whenever a principal '.... is sought to be held liable on the ground of ratification, either express or implied, it must be shown that he ratified upon fill knowledge of all material facts, *or that he was willfully ignorant, or purposefully refrained from seeking information,* or that he intended to adopt the unauthorized act at all events, under whatever circumstances.' (emphasis supplied).

15. Although there is substantial evidence to support the claim of ratification (Hosking signed October 25, 1985 letter, spoke with Harris regarding the loan prior to disbursement of the loan proceeds, turned over the $32,000.00 check to Tunick, and "purposefully refrained from seeking information" from Tunick or Levinson regarding the AIB loan, it is unnecessary for this Court to rule in favor of AIB on this theory in view of the preceding conclusions of law.

16. Based upon the evidence and foregoing Findings of Fact, this Court concludes that AIB has met its burden of proving each of the elements of its Section 523(a)(2)(B) claim by "clear and convincing evidence." Accordingly, the debt owed by Hosking to AIB, including principal, interest and reasonable attorneys' fees and costs, is hereby adjudicated to be non-dischargeable. Consequently, AIB is entitled to a final judgment against Hosking in the principal amount of $33,420.37, plus accrued interest. Pursuant to Bankruptcy Rule 9021(a), the Final Judgment, which also will include a specified award of reasonable attorneys' fees and costs, shall be entered in accordance with these Findings of Fact and Conclusions of Law.