In re John E. KABEL d/b/a John E. Kabel Builders, and Secretary of Kabel Builders, Debtor.

AMERICAN CREDIT SERVICES, INC., Plaintiff,

v.

John E. KABEL d/b/a John E. Kabel Builders, and Secretary of Kabel Builders, Defendant.

Bankruptcy No. 91–11255 K.
Adv. No. 91–1138 K.

United States Bankruptcy Court, W.D. New York.

March 4, 1992.

David L. Rasmussen, Harris, Beach & Wilcox, Rochester, NY, for plaintiff.

Daniel E. Wisniewski, Buffalo, NY, for defendant.

MICHAEL J. KAPLAN, Chief Judge.

This matter came on for trial on January 24, 1992. American Credit Services, Inc. ("ACSI") seeks to have this Chapter 7 debtor's indebtedness on certain auto loans declared nondischargeable under 11 U.S.C. § 523(a)(2). This is a "core" proceeding. The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the General Order of Reference entered by the District Court on July 13, 1984.

The issues presented in this proceeding emerge from a curious set of facts and an interesting trial strategy on the part of the plaintiff.

### The Facts

I make the following findings of fact:

The debtor had been a self-employed home builder from 1956 to 1991. In recent years he has generated gross revenues in the mid- to high-six-digit figures. He has had his tax returns prepared by a lawyer or CPA for many years, and those returns typically reflect a net taxable income in low five-digit figures. ($21,000 in the year he filed Chapter 7, 1991.)

Since 1956 he has purchased approximately 30 vehicles for business and personal use, all but one of which were purchased from dealerships owned by lifelong acquaintances, the Mancusos. The other vehicle was bought in 1988 from a dealership owned by another lifelong acquaintance, Zigrossi.

All vehicles were financed. All vehicle loans were fully satisfied until the three loans outstanding at the time of the filing of this Chapter 7 case on April 8, 1991.

In 1980 or 1981, after having bought numerous vehicles from a Mancuso dealership, the debtor was told by Mancuso dealership's management "not to bother" filling out the loan applications anymore—Just sign them in blank and the dealership would fill in the rest. The extent to which the debtor gave the dealer any updated information for this purpose, to supplement the information "on file," is unclear. But the debtor unequivocally denies giving the dealer any updated information regarding his earnings.

ACSI received the three applications in question directly from the Mancuso dealerships. Two reflected a "salary" of $65,000 and the third, $51,000. All were submitted in the year 1990. ACSI never communicated with the debtor in any way. It did communicate with Mancuso. It approved the loans. In 1990, the debtor's reported net taxable income was less than $14,000.

By the time of the trial ACSI sought and received permission to repossess two of the three vehicles. After sale of the two, ACSI was still owed over $30,000 on the three loans, with security remaining only in the third vehicle, the one the debtor is still driving.

### Trial Strategy

The plaintiff has adopted an unusual trial strategy. It has not produced (1) the loan officer who approved these loans, (2) the salesman who could (if anyone could) rebut the debtor's claims that he signed the applications in blank and gave no earnings information, (3) anyone at Mancuso who might rebut the debtor's version of his "course of dealing" with Mancuso since 1980 or 1981, or

(4) any evidence of the relationship between the dealer and ACSI.

Rather, the plaintiff rests on principally three elements of proof.

1. As standard procedure, ACSI systematically relies on the applicant's signed statement of "salary" in transactions such as these, in which ACSI will be "long" or nearly "long" and in which the salary stated appears to be reasonable in light of the applicant's stated occupation. ("Long" means that ACSI will be lending more than the purchase price of the vehicle, in light of amounts still due on the vehicle being traded.) It uses credit reporting services to check credit history, but makes no independent verification of earnings unless the stated salary does not appear reasonable.

2. The debtor swears that he signed the single Zigrossi-originated application (not one of the loans in issue) in blank despite having no prior "file" with Zigrossi (That application represents the debtor's "salary" as $2,000/week ($104,000 per year).) I am asked to draw the inference that the debtor did in fact give earnings information to Zigrossi, and the further inference that he did so to Mancuso as well.

3. The three Mancuso-originated applications at Bar differed in ways that could only reflect some input from the debtor.[1]

Thus the plaintiff clearly challenges the debtor's credibility and rests upon its asserted right to rely upon the signed applications it received from the dealership which obtained the applications.

## Analysis

■ It would seem that the plaintiff's strategy is this: if the Court is convinced that the debtor is currently not accurate or forthright under oath and did in fact provide earnings information to Mancuso, then it may be inferred that he did then knowingly overstate his income with intent to mislead ACSI.

Furthermore, in reviewing the applicable law it is seen that the weight of authority is vastly against a debtor who claims that he or she signed a credit application in blank or without reading it. From such recklessness is fraud inferred.[2] I generally concur.

But whether or not Kabel signed the applications in blank and whether or not he provided the "salary" figures reflected thereon, ACSI cannot prevail in this action for it has failed to establish by a preponderance of the evidence that it relied on those figures or that any such reliance was reasonable.[3]

ACSI called only two witnesses—the recovery manager who worked on the Kabel file after default, and the Debtor.

The Debtor does not know how ACSI processed his loan applications. He only knows that on some of the many applications (he does not know which ones), the dealership called and said that "they" want more of a down payment. (He testified that he knew that the "they" meant ACSI.)

The recovery manager who testified did not process the loans. He testified only as to ACSI's customary practices and the contents of the Debtor's file at ACSI regarding the loans in question. As to one of the loans in question he testified that the file showed that because the loan was "long," ACSI contacted the dealer. And he testified that ACSI "would have" relied heavily upon the "salary" stated on the applications in approving a "long" loan.

What happened when ACSI called the dealer? Who at ACSI spoke to whom at the dealership? In determining that it would approve the loans with some (or more) money down, did ACSI in fact rely upon the "salary" stated on the application, or did the "dealer" (salesperson, sales manager, finance

---

1. E.g., the name given as a personal reference on one application is different than that on the others. Some banking references are also different.

2. *In re Weiner*, 86 B.R. 912 (Bkrtcy.N.D.Ohio 1988), and *In re Hosking*, 89 B.R. 971 (Bkrtcy. S.D.Fla.1988), and cases cited therein. See also other cases cited at 94 ALR Fed. 437, § 5[a].

3. It is important to note that 11 U.S.C. § 523(a)(2)(B)(iii) commands proof that the creditor "reasonably relied" upon the false financial statement. Today's holding is based upon the failure to prove reliance. I will leave for a proper case the issue of whether ACSI's procedures, discussed later, produce reliance that is "reasonable."

manager, whomever) reassure ACSI of the fact that Mr. Kabel had purchased many vehicles from them on ACSI financing, without problem?

As to another of the three loans, the recovery manager testified that the loan was initially declined "because of credit history," but that it was "overridden on the basis that it was 'not very long' and because the income seemed sufficient." Who overrode the original declination? What credit history? To what extent was it the fact that the loan was "not very long" that was determinative, rather than the stated income? Did the communication with the dealer as to the *first* loan play any role?

As to the third loan he testified that it too was at first declined because of "credit history," then overridden. This time it was overridden because the loan was not "long," because "of the previous two loans," and because of "sufficient income." Again, the same questions.

These questions exist because the witness' testimony as to what the ACSI files show that someone at ACSI "would have" done, based on ACSI's typical policies, simply fails to provide firsthand knowledge of what in fact these lending decisions were based upon.

While the Debtor has offered an explanation as to why he failed to present evidence from those who he claims told him to sign the applications in blank, ACSI has offered no explanation as to why witnesses who might be "peculiarly" available to ACSI (those who processed the loans for ACSI) have not been brought forward.[4]

In sum ACSI has failed to carry its burden of proof.[5]

■ It is important to make certain points clear. When it is not disputed that a loan application was signed by the Debtor, then the contents of the application should, in general, be attributed to the Debtor and entitled at least to great weight, and perhaps decisive effect. But in carrying the burden of proof under 11 U.S.C. § 523(a)(2), a creditor may not rest upon such signature as a substitute for proof that it "relied" upon the contents of the application, and that its reliance was reasonable.

The obligations of the Debtor to ACSI are discharged as personal obligations of the Debtor. Let Judgment enter accordingly.

---

4. I do not know whether such persons are still in ACSI's employ, or how accessible they might be to the debtor. However, I draw no negative inference from ACSI's failure to produce them. I merely conclude that ACSI has not offered any witness with firsthand knowledge of the approval of these loans.

5. Prior to the case of *Grogan v. Garner* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the burden of proof in § 523(a)(2) cases was "clear and convincing evidence" in some jurisdictions. That case sets ordinary "preponderance" as the pertinent standard.