**In re Randall T. WALKER, Debtor.**

**UNIT NO. 1 FEDERAL CREDIT UNION, Plaintiff,**

v.

**Randall T. WALKER, Defendant.**

**Bankruptcy No. 94–10117 K.
Adv. No. 94–1082 K.**

United States Bankruptcy Court,
W.D. New York.

April 10, 1995.

48

Morris L. Horwitz, Horwitz & Frankel, Tonawanda, NY, for plaintiff.

John D'Amato, Barry Sternberg Attorney at Law, Kenmore, NY, for defendant.

## DECISION AFTER TRIAL

MICHAEL J. KAPLAN, Chief Judge.

This is a dischargeability proceeding under 11 U.S.C. § 523(a)(2)(B), which has been fully tried to the Court and submitted for decision. The following constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. The Court finds that the Plaintiff has failed to carry its burden of proving that the Debtor signed an incomplete loan application with "intent to deceive," despite his recklessly not having read it.

### Facts

The facts of this case are simple. The Debtor had an ongoing relationship with the credit union and went to the credit union, by appointment, to borrow an additional $1300 for automobile repairs. Because of his ongoing relationship with the credit union, and because of its automated system, he was not

handed a credit application to fill out and sign. Rather, the loan officer called up his existing file on a video screen visible only to her. By her account, the loan officer set aside the usual thirty minutes for this appointment, during which she asked particular questions of the Debtor to confirm the information she had, entered the updated information into her computer, printed out the completed loan application, and handed it to the Debtor. Also by her account, she discussed the information contained therein with the Debtor and made sure he understood it and agreed with its completeness and accuracy, whereupon he signed it.[1] Since his debt-to-income ratio as represented on the application was favorable, she approved the transaction, rolling over his existing account balance and extending the additional monies. She then went to the vault and prepared or obtained a check for the $1300 and gave it to him.

In fact, the application did not recite that a major circumstance had changed in his financial condition. He had bought a house, and now had mortgage payments to make. Had that been disclosed, his debt-to-income ratio would have dramatically changed, resulting in that loan officer's inability to approve the loan. She would have had to refer the loan to the loan committee for further consideration, and the loan committee would have had to deny it pursuant to the credit union's standard practice.

## Issue

Although counsel for each side has ably addressed the myriad legal issues surrounding "false financial statement" litigation in those instances in which a debtor denies knowledge of the contents of the financial statement he signed, the Court believes the facts of this case to be peculiarly *sui generis* and finds there to be no need to address any of those legal issues, save one: whether a prospective borrower's signing of a materially false financial statement *ipso facto* constitutes the reckless disregard or reckless indifference that fulfills the statutory requirement that the borrower have intended to deceive the creditor. 11 U.S.C. § 523(a)(2)(B)(iv).

## Discussion

 Without hesitation, this Court reaffirms its finding in previous cases that fraud cases like this may never be decided against a debtor before examining the totality of circumstances.[2] The fact that a debtor signs

---

1. For his part, the Debtor testified that he was asked only one or two questions, the tenor of which was, "Is everything still the same?" Believing the question to be referring to the terms of the loan as compared with previous loan transactions, he answered that he guessed it was, and did not read the work product when asked to sign. Debtor says she overlayed and folded the documents so that only the signature lines were visible, and that he did not see or ask to see their substantive content. (Counsel for the Plaintiff calls this the "origami defense.")

2. This is the third in a series of "I signed it, but I didn't read it and didn't mean it" defenses raised before this Judge.

 In the case of *American Credit Services, Inc. v. Kabel* (*In re Kabel*), 184 B.R. 422 (Bankr. W.D.N.Y.1992), the Court found for a self-employed debtor (a building contractor) who bought and financed more than thirty motor vehicles through the same dealer over a long period of time and who accepted the dealer's invitation (after ten or twelve such purchases and full repayments) to sign the subsequent financing applications in blank and let the dealer fill them out from information "on file." At the time of his bankruptcy, three loans were outstanding, and his income had been materially overstated on the applications. The finance company in that case communicated only with the dealer, and as a matter of internal policy "never" would communicate with the borrower or independently verify income information that appeared to be consistent with the occupation listed on the application. I found the debtor's explanation for signing "in blank" to be reasonable, and found no intent to deceive.

 In the case of *Buffalo Fire Department Federal Credit Union v. Butski* (*In re Butski*), 184 B.R. 193 (Bankr.W.D.N.Y.1993), I found against a debtor who claimed that he did not know that the car loan in question was to be a secured loan, but who had signed a Department of Motor Vehicles form that clearly and conspicuously was a "Notice of Lien" form, and who clearly understood the operation of motor vehicle title and lien law in this state.

 In the *Kabel* case I stated, "When it is not disputed that a loan application was signed by the Debtor, then the contents of the application should, in general, be attributable to the Debtor and entitled at least to great weight, and perhaps decisive effect." *Kabel* at 425. *Butski* reiterated that view and added, "The fact that one does not read the documents he or she signs does not relieve him or her (absent a showing of special circumstances) from being charged with knowledge of their contents," suggesting that such

an inaccurate financial statement does not, of itself, inexorably lead to the conclusion that the debtor intended to deceive the creditor; and in the case at bar, that is all the creditor has proven.

■ Section 523(a)(2)(B)(iv) requires that the debtor have made or published a false financial statement "with intent to deceive" in order for a debt incurred in reliance thereon to be excepted from discharge. As noted below, the requisite intent may be inferred from the circumstances and may be found in the act of a debtor's "reckless disregard" for the accuracy of the document.

Signing a loan application (as opposed to some other kind of statement of financial condition) is an act that should be visited with some degree of solemnity. Indeed, some might feel that a debtor's signature on a false loan application should, of itself, make a prima facie case and should shift the burden of going forward to the debtor, as might be the effect of having acknowledged, sealed, or sworn when signing.

However, it was the very lack of solemnity with which some lenders approached the loan application process, that in 1978 nearly led Congress to abolish the false financial statement exception to discharge. As explained by Judge Spector in the case of *Security Federal Credit Union v. Carter* (*In re Carter*), 78 B.R. 811, 816–18 (Bankr.E.D.Mich. 1987), Congress had little regard for lenders who filled out loan applications for borrowers and then elicited the borrower's signature in an atmosphere or environment that belittled the significance of the signature and application. Such lenders made a practice of not giving applicants enough space on the document to be complete or enough time to be accurate, telling applicants that the information contained on the incomplete or inaccurate application was not relevant because the

lending decision would be made on a different basis, such as a credit report or income verification. Sometimes, the lender would suggest to the debtor that only "major" items need be included and numerous other obligations could be left out. But later, if bankruptcy ensued, the same lender would use the falsity in the application as a basis for threatening dischargeability litigation in order to obtain reaffirmation of the debt from the debtor who feared added legal costs.

■ It is clear that when Congress elected to retain the false financial statement exception, it knew that not every signed loan application that was incomplete was fraudulent; such applications were not always made "with intent to deceive." Some, however, are made with ill intent, but because of the inherent difficulty of proving a debtor's state of mind, it is only by some judicial construct like "reckless disregard" for the truth that the creditor is able to prove the intent element of § 523(a)(2)(B). "Reckless disregard" has earmarks: It may be found where the debtor comprehends the information addressed in the document and has no reasonable explanation for any misstatement; in a pattern of falsity in dealings with the creditor; in a lack of credibility before the Court[3] (which might make the Court more inclined to find that there was a broader fraudulent scheme); where the debtor allows a self-interested third party to make representations on the debtor's behalf (over the debtor's signature) to the detriment of a disinterested potential lender,[4] or other contexts. But it is the word "contexts" that is important. Although a debtor may not lightly discredit his or her own signature in defense of an allegation of fraud by false financial statement, the burden remains on the creditor to prove fraud by a preponderance of the evidence, and that requires a totality of circumstances amidst which the reckless disregard that be-

"special circumstances" might exist where the debtor "was deceived about the contents of what he was signing...." *Butski* at 195.

The present case continues the exploration of the general rule that holds a debtor accountable for his or her signature, and the special circumstances that may relieve the debtor of such accountability.

3. *See* the analysis of reckless disregard as a means of inferring intent offered by Judge Berk

in *Hudson Valley Water Resources, Inc. v. Boice* (*In re Boice*), 149 B.R. 40, 47–48 (Bankr. S.D.N.Y.1992).

4. *See Massey–Ferguson Credit Corp. v. Archer* (*In re Archer*), 55 B.R. 174, 179 (Bankr.M.D.Ga. 1985). *But see In re Kabel,* discussed *supra* note 1, where the third party was the lender's agent.

speaks the requisite intent to deceive may be found.

■ Beyond the sole legal issue already addressed, this is a case dependent strictly upon the sufficiency of proof, and the Court concludes that the Plaintiff has failed to prove its case by a fair preponderance of the evidence.

In almost every other instance within the knowledge of the Court wherein the debtor claimed not to have read the false application, more evidence was available to the creditor than is available to the creditor here to support the finding of reckless disregard tantamount to intent to deceive. But the creditor here, it appears, was in transition from a manual method of preparation of loan applications to an automated method. The method of preparing loan applications used at the time of the transaction at issue here was such as to virtually assure the Plaintiff that it would never be able to prove that when the Debtor signed the application, he knew that it was false and that he either intended to deceive or that he acted with reckless disregard that was tantamount to an attempt to deceive. With only very minor adjustments to this creditor's method of preparing its loan applications, it will likely never again suffer the absence of proof that is fatal to its case today, as discussed below.

Under the facts of this case, the only way that the credit union would be able to carry its burden of proof would be if the Debtor did not dispute them. This is because the procedure in use by the credit union causes this case to be of the same ilk as those which caused Congress, in 1978, to seriously consider abolishing the "false financial statement" exception to discharge.

■ In the present case, in which it is clear that the information on the loan application was placed on it by the loan officer, but where the Debtor denies having been asked any specific question about where he was living or what new debts he had incurred, how can the creditor possibly prove its version of the facts, short of successfully impeaching the Debtor's credibility on the witness stand? When there is no proof of actual deceit and it is the word of the loan officer against the word of the debtor, will the debtor's signature alone tilt the balance in the creditor's favor? In light of the concerns of Congress, this question must be answered in the negative.

All the credit union has to do in order to prevail in this type of case is to adopt some procedure that would document the care with which the loan application was completed and checked with the borrower, thereby removing the transaction from the type of environment for which Congress expressed disdain. For example, if the credit union were to hand the computer generated loan application to a potential borrower and say, "Take it home, read it over, make sure it's accurate and complete, and bring it back tomorrow and sign it when you come in," that would probably suffice. Or if the applicant were required to initial the document at various strategic places thereon to demonstrate that attention had been called to critical elements such as address, place of employment, income, outstanding debts, and the like, the Court would be far less likely to believe a debtor who claims that he or she didn't read the application, didn't know of its falsity or incompleteness, or who claims that the loan officer treated the application as having little significance.

It also should be noted that unlike most loan applications, this one contained much complicated "fine print" at the signature line, rather than a bold caution to read the application completely and not sign it if there are any blanks or inaccuracies.

There may be other similar easy steps that could be taken to preserve the credit union's ability to make a § 523(a)(2)(B) claim, or, if it chooses, it may make no changes at all, and forego § 523(a)(2)(B) claims unless it possesses some other, extrinsic evidence beyond the false application itself and the debtor's signature.

The Complaint is dismissed on the merits. The Debtor's request for attorney's fees under § 523(d) is denied, as the Plaintiff's position was not without justification.

Judgment shall enter accordingly.

SO ORDERED.