## Richmond

LINK ASSOCIATES, ET AL.

V.

JEFFERSON STANDARD LIFE INSURANCE COMPANY

April 30, 1982.

Record No. 791572.

Present: All the Justices.

*Terrence Ney (Haynie S. Trotter; Stephen M. Colangelo; Boothe, Prichard & Dudley*, on briefs), for appellant.

*Randolph W. Church, Jr. (Robert H. J. Loftus; Ann W. Mische; McCandlish, Lillard, Church & Best*, P.C., on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

The focus of this appeal is shopping-center development and financing. The controversy involves a lender's commitment for a permanent loan in an amount less than requested by a borrower. Specifically, we consider whether alleged misrepresentations by the lender were waived or ratified by the borrower.

In November of 1977, appellants Link Associates, a Virginia limited partnership (and its general partners Link Properties, Inc. and Redstone Development Corporation) and Boulevard Associates, also a Virginia limited partnership (and its general partner Redstone Development Corporation), hereinafter often collectively referred to as Link, filed a bill in equity against appellee Jefferson Standard Life Insurance Company. Alleging mutual mistake and constructive fraud on the part of the defendant, the plaintiffs sought reformation by way of rescission of certain provisions of ground leases executed by Link as security for permanent mortgage financing upon the leasehold interests of Sections I and II of Loehmann's Plaza, a shopping center located in Fairfax County. After hearing evidence ore tenus for ten days, the chancellor decided misrepresentations had been made by Jefferson Standard to the plaintiffs, but that the plaintiffs had waived and ratified those misrepresentations.

We awarded Link an appeal from the July 1979 decree dismissing the bill of complaint. Link asserts the trial court erred in finding waiver and ratification. Jefferson Standard assigns cross-error attacking the finding of misrepresentation.

Section I of the shopping center was developed in the late 1960s. Jefferson Standard was the lender. The borrower was Boulevard Associates, formed by Samuel J. Rosenstein, Vail W. Pischke and another to develop, own, and operate Section I. In general terms, financing of the transaction involved a sale and leaseback of the real estate, the lender providing 75-80 percent of the funds and the borrower furnishing equity for the difference.

About the time Section I was completed, negotiations began in January 1969 for financing of an additional nine acres, designated Section II. Link Associates had been formed to develop, own, and

operate Section II. The principals of that group were initially Pischke, Rosenstein and another, joined later by Richard M. Aronoff and Ernest M. Carter. Pischke and Aronoff were practicing attorneys. Carter was president of Guaranty Bank and Trust Company, and Pischke was Chairman of the Board. Rosenstein, the leader and key individual in the plaintiff limited partnerships and corporations, had extensive experience in business, shopping center development, and mortgage financing.

During early 1969, a series of discussions took place in Fairfax County about the proposed financing. Representing Link were mainly Rosenstein and Carter. Participating for Jefferson Standard were its employees Drew C. Boggs, Dennis G. Saunders, and L. P. Maupin, Jr. Boggs and Saunders were based in Maryland and were district supervisors in defendant's Mortgage Loan Department. Maupin was based at the Home Office of Jefferson Standard in Greensboro, North Carolina, and was a company vice-president in the Mortgage Loan Department. Also taking part in the discussions was William I. Darter, Jr. of Frederick W. Berens, Inc., the mortgage broker and construction lender.

During the discussions, "a new type" of shopping-center financing was considered. Link's principals testified that defendant's representatives offered to provide "100 percent financing," that is, according to Link, Jefferson Standard would finance the entire cost of constructing Section II of the shopping center. The borrower would not have to provide any "cash equity." But in exchange for this, the permanent lender would receive, in addition to loan interest, an option to purchase a 50 percent interest in the entire shopping center and a percentage of return on the rental receipts for Section II.

In May of 1969, Link applied to defendant for $2,200,000 in permanent financing for Section II at 8 ½ percent interest. The application did not mention "100 percent financing." Link agreed to pay 15 percent of the rental receipts over a certain amount to defendant and agreed that defendant would receive an option to purchase a 49.9 percent interest in the shopping center. Thereafter in July of 1969, defendant tendered a loan commitment to Link for only $2,025,000 at 8 ¾ percent interest. The option to purchase was unchanged but defendant asked for 25 percent return on the rental receipts.

Representatives of Link were unhappy with this response because they were reluctant to relinquish as much as 25 percent of

the rental returns and because they thought $2.2 million would be needed to build Section II, even though construction plans had not been prepared. Nevertheless, Link decided to accept the terms of the commitment, believing they could limit construction costs. In addition, Link's principals felt the amount of the permanent loan might be enlarged if construction costs increased. This belief was based on their experience with Section I. When additional funds were required for construction of that phase of the shopping center, Jefferson Standard provided them.

Consequently, Link obtained a construction loan, and work began on Section II. As construction progressed, costs were higher than anticipated, in part because more floor space was required by one of the tenants. Link requested an increase in the permanent loan. Defendant refused.

On May 28, 1971, Link and defendant closed on the permanent financing at $2,025,000. Disbursement was made in the amount of $2,525,000 which included the land acquisition cost of $500,000. The loan was at 8 ¾ percent interest, with 25 percent rental return, and with an option to purchase 49.9 percent of the center.

Link claims it closed on the transaction, which provided less money than was requested, because it was "forced" to do so by virtue of a December 1969 "tripartite agreement" with defendant and Berens, the construction lender. Under the agreement, Link promised that in return for receiving construction financing from Berens, it would seek its permanent financing from defendant. Thus, Link says, it either had to go through with the closing, accept the limited funds, and borrow the difference from third parties, or essentially forfeit the transaction. In addition, Link's principals believed that, in time, defendant would increase the amount of the loan.

The cost of construction was approximately $3.3 million. Link borrowed about $700,000 to complete Section II from two other sources; Riviere Realty Trust loaned $600,000. As a condition precedent to that advance, Riviere insisted upon an option to purchase a 50-percent interest in Sections I and II. Link then obtained a release from Jefferson Standard of its option to purchase. In consideration of the release, defendant required an increase in the interest rate for Section I from 7 ¼ percent to 7 ¾ percent and a 15 percent participation in Section I percentage rentals.

During the period of six and one-half years, running from the loan closing to the filing of this suit, there were numerous meet-

ings and much correspondence between Link's principals and representatives of defendant. The main topic at first was Link's effort to obtain more funds from Jefferson Standard. Later, Link wanted defendants' rental participation percentages reduced so that, according to Link, the participation by defendant would bear a proper relationship to the funds it furnished. During this period, defendant's representatives received the requests and forwarded them to the Home Office. Defendant's Loan Committee did not authorize any further advances for Section II and did not agree to alter the percentages. This suit ensued, Link seeking reformation of the percentage rentals.

At the conclusion of the trial, and after argument of counsel, the trial judge, in an oral opinion incorporated by reference into the final decree, stated "that the Defendant did misrepresent to the Plaintiffs" and "that misrepresentations were made by the Defendant." Although the chancellor did not specify what representations were made, Link argues the court obviously found as a matter of fact that defendant's employees falsely represented to Link's principals, during the period of negotiation from January 1969 to July 1969 when the commitment was issued, that defendant would provide *all* the financing necessary for construction of Section II.

Based upon a study of this voluminous record, we have some doubt the evidence is sufficient to support any finding the trial court may have made that Boggs, Saunders, or Maupin were guilty of actionable misrepresentations or, if so, that they had actual or apparent authority to bind Jefferson Standard to a loan commitment. There was evidence that defendant's employees emphasized to Rosenstein and his associates during the negotiations that commitment authority was exercised only at the Home Office by the Loan Committee. Nevertheless, we will assume, but not decide, that the finding of "misrepresentations" was correct, and will not address the cross-error. Consequently, we will speak to the issues of waiver and ratification raised by Link's assignment of error.

█ The law on the subject is settled. Prompt action is required by the deceived party upon his discovery of misrepresentations amounting to constructive fraud. A party intending to repudiate a contract on the ground of fraud must act within a reasonable time and with great punctuality upon learning of the wrong. He will be deemed to have waived his right of repudiation if, after discovery

of the fraud, he treats the contract as a subsisting obligation. *Finch* v. *Garrett*, 109 Va. 114, 115, 63 S.E. 417, 418 (1909). *Accord, Employers Commercial Union Ins. Co.* v. *Great American Ins. Co.*, 214 Va. 410, 414-15, 200 S.E.2d 560, 563-64 (1973). And the duty of prompt disaffirmance is not dependent upon the proof of harm to the deceiving party caused by the delay. *West End Real Estate Co.* v. *Claiborne*, 97 Va. 734, 752, 34 S.E. 900, 907 (1900).

> "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value." *Grymes* v. *Sanders*, 93 U.S. 55, 62 (1876), quoted in *United States* v. *Idlewild Pharmacy, Inc.*, 308 F.Supp. 19, 23 (E.D. Va. 1969).

But proof of waiver, usually a question for the trier of fact, must be "clear." *Branch* v. *Buckley*, 109 Va. 784, 794, 65 S.E. 652, 655 (1909). A waiver, an equitable principle often applied at law, *see* 214 Va. at 412, 200 S.E.2d at 562, must be distinctly made with full knowledge of the rights waived; and the fact that the defrauded party "knows his rights, and intends to waive them, must plainly appear." *Wilson* v. *Carpenter's Adm'r*, 91 Va. 183, 192, 21 S.E. 243, 246 (1895). And mere delay of the deceived party in rescinding a contract after learning of the fraud will not amount to waiver of the wrongful act, if the delay results from a reasonable expectation that the wrongdoer will fulfill the repeated assurances of its agent to grant the relief to which plaintiff is entitled. *White* v. *American National Life Insurance Co.*, 115 Va. 305, 309-10, 78 S.E. 582, 583 (1913).

Link, noting defendant has not been prejudiced by the delay in bringing suit, argues it "repeatedly and continuously," before and after the closing, protested defendant's refusal to provide "100 percent financing." It notes Rosenstein wrote many letters to de-

fendant and had numerous "conversations with Maupin seeking a revision of the loan arrangement." It says "Maupin responded sympathetically" and plaintiff "expected" defendant to amend the loan transaction "to honor its original commitment."

Anticipating defendant's contention that Link accepted the benefits of the bargain and is unwilling to abide by it obligations, Link argues it is actually being penalized because it entered the transaction upon the misrepresentation about 100 percent financing. Link analogizes the relationship with defendant to a partnership in fact, but not in law. Link says its "partner," the defendant, promised to furnish funds up to a certain amount and "take back" a certain portion of the earnings, the rental receipts. But, urges Link, its partner did not fully perform by providing all the financing and Link was forced to go elsewhere to finance a "good part" of the center. Nevertheless, Link contends, it is still paying percentage rent on the entire shopping center to defendant which did not furnish its 100 percent.

Jefferson Standard argues the evidence is clear that there were repeated acts of waiver and ratification beginning in 1969, prior to and at the time the loan commitment was accepted by Link as a completed document, and continuing throughout the period until this suit was filed. We agree.

█ The record, and especially the documentary evidence, is replete with instances of waiver and ratification in a transaction that Link seeks to portray as an open-ended promise by Jefferson Standard to finance the entire and ultimate cost of Phase II. Parenthetically, the record shows that the principals of Link were highly skilled, by education and experience, in business, mortgage banking, law, and shopping-center development. All of the important documents and legal instruments that were not actually drafted by Link's attorneys were subject to the careful scrutiny of Rosenstein or Link's lawyers. Yet in none of the operative instruments was "100 percent financing" mentioned or was there any attempt made to define the term, or a similar concept.

Assuming for the purpose of this discussion that defendant's employees uttered actionable false representations during the negotiation period prior to the date of the loan commitment and that grounds for rescission existed at that time, we will review some of the instances of waiver and ratification, as plainly shown by the evidence. The first loan application for Section II was dated May 7, 1969 seeking $2.2 million. It did not request "100 percent

financing," but a provision of the application excluded representations not contained in the application or commitment. Paragraph 13(9) read in part:

> "This application and any commitment which may be issued by you and accepted by me shall constitute the entire agreement between you and me . . . ."

Moreover, almost three weeks later, Link submitted a second application making a revised request for the $2.2 million. That document also contained paragraph 13(9), and did not mention "100 percent financing." Attached to this application was an 11-page addendum, signed by Pischke for Link, setting forth the sale leaseback and purchase option. The addendum did not mention "100 percent financing."

In addition, as defendant points out, when Jefferson Standard refused to commit to lend $2.2 million, agreeing only to $2,025,000, Link was put on notice that defendant did not intend to furnish financing for whatever sum the project was to cost.

Also, Pischke accepted in writing on August 1, 1969, "all of the terms and conditions" of defendant's commitment. On that day, he wrote Saunders stating "the provisions of the attached mortgage loan commitment are acceptable." There is no evidence that Rosenstein, or any other representative of Link, asked why the $2.2-million request was denied or asked whether any agreement for "100 percent financing" was still viable.

Then, subsequent to approval of the commitment and before closing, Link executed documents recognizing the commitment as binding and complete. For example, the December 1969 "tripartite agreement" reaffirmed the $2,025,000 commitment. During the summer of 1970, Rosenstein obtained an extension of the permanent loan closing date; he did not seek or demand an increase in the loan to cover 100 percent of construction costs.

Subsequently, Rosenstein wrote Maupin on April 7, 1971, indicating "no difficulty" in being able to close the permanent loan in May. In that letter, he sought to "reopen this matter for consideration" and to increase the mortgage to $2,350,000. Noting the loan commitment "was predicated upon the concept of 100% financing," Rosenstein asked for the increase "even though it does not cover our actual cost." Again, this was a clear recognition by Rosenstein that he did not then believe defendant was committed

to financing the full cost of Section II, irrespective of what Rosenstein may have understood to have been defendant's promise during preliminary negotiations.

After the permanent loan was closed, Link repeatedly treated the transaction with defendant as binding and subsisting. In the course of effectuating defendant's release of its purchase option in July of 1971, an amendment of the ground lease for Section I was executed and Aronoff wrote Maupin seeking approval for the Riviere loan. Plaintiffs made no complaint about the prior transactions or mentioned any alleged misrepresentations. In August of 1971, Aronoff advised defendant of the Riviere loan closing, writing:

"I want to take this opportunity, on behalf of myself and Vail Pischke, Ernie Carter and Sam [Rosenstein], to heartily thank you for your gracious cooperation and understanding in helping us to close this transaction."

These are hardly the expressions of one who does not treat the original transaction as a subsisting obligation.

In 1972 and 1973, Link paid percentage rent to defendant for Section II. On May 1, 1973, Rosenstein wrote Maupin, expressing "dissatisfaction" with the participation provision of the mortgage, and said: "We recognize that this is a completed transaction which is difficult to re-open." Reviewing the initial loan commitment, Rosenstein wrote it was "the intent" for Jefferson Standard to provide "what was at that time considered to be reasonably close to 100% financing." But instead of demanding as a matter of right that the full cost of the center be financed, Rosenstein said (emphasis added): "We therefore *respectfully request* that the question of participation in this center be *modified and amended* to its originally intended purpose." This, too, is a clear indication that Link considered the original transaction to be binding.

Even as late as five months before this suit was filed, Rosenstein was treating the whole transaction as subsisting. In June of 1977, Maupin approved Rosenstein's request to deduct a sum expended for improvements in Section I from percentage rent payments.

The trial court found *United States* v. *Idlewild Pharmacy, Inc., supra*, "apropos," and we also find it persuasive. There, in an action by the government to collect rent due, a tenant at Dulles Airport sought rescission of the lease on the ground that anticipated

passenger volume had been misrepresented. The lease required the tenant to pay as rental a percentage of the gross sales receipts, with a minimum guaranteed annual rental. The tenant never paid the minimum rental but Judge Kellam found that the tenant ratified the lease:

> "Defendant continued to operate under the contract for a period of five years. It took no action to rescind the contract, or to repudiate or revoke it. It not only continued to operate under the contract, but paid the percentage of rent called for thereby, and attempted to negotiate an amendment. In all probability it did so hoping each year the traffic would increase. One entitled to relief can affirm or avoid the contract, but he cannot do both; if he adopts a part, he adopts it all. He must reject it entirely if he desires to obtain relief. Defendant cannot accept the benefits of the contract and then assert he is entitled to be relieved of its obligations. His action was a confirmation of the contract and a waiver of any alleged misrepresentation, mistake, fraud or other wrong. The time for him to demand relief is upon the discovery of the alleged misrepresentations." 308 F.Supp. at 23.

■ Finally, we reject out of hand Link's contention that the six and one-half year delay before acting to rescind should be excused because it was induced by the promises and assurances of defendant that it would "remedy the situation." Implicit in the trial court's finding of fact is a repudiation of this position. Moreover, the facts of this case distinguish it from those like *White* v. *American National Life Insurance Co., supra*, relied on by Link. For example, in *White* a delay of one and one-half years was excused where the delay was induced by an authorized agent's "repeated assurances" that the fraud would be cured. 115 Va. at 310, 78 S.E. at 583. Here, there were no such avowals by defendant's employees. In response to Link's efforts, particularly during the period 1973-77, to have the transaction modified (they were actually attempts to renegotiate), Jefferson Standard never indicated it believed it was required to take any action and never promised to undertake to change the transaction to comport with "100 percent financing." Defendant's reactions to Link's requests are illustrated in this summary of Maupin's conduct as described by Rosenstein:

"Mr. Maupin's response on many occasions was the same, he said that he was sympathetic to our position, [']all I can do is take it to the committee. Every time I take it to the committee, I have been getting bounced out['] . . . ."

For these reasons, we hold the trial court was correct in finding the evidence was sufficient clearly to prove Link waived and ratified any actionable misrepresentation made on behalf of Jefferson Standard. Accordingly, the judgment appealed from will be

*Affirmed.*