**In re Richard H. PLEASANTS, IV, Debtor.**

**E.G. and Randy P. Kendrick, Plaintiffs.**

**v.**

**Richard H. Pleasants, IV, Defendant.**

**Bankruptcy No. 97–12702MVB.
Adversary No. 97–1313.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Feb. 24, 1999.

Stephen Sayers and Jill Dennis, Hunton & Williams, McLean, VA, for plaintiffs.

Robert O. Tyler, Tyler, Bartl, Burke & Albert, Alexandria, VA, for Defendant.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

In the case at bar, we must determine the dischargeability of a claim under 11 U.S.C. § 523. After a two-day trial, the Court took this matter under advisement. For the following reasons, we conclude defendant knowingly misrepresented his professional status as an architect with the intent to deceive and to induce plaintiffs into hiring him to perform professional architectural services. Accordingly, we find plaintiffs' claim nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

The Court possesses jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(I) and 1334(b). Venue is proper by 28 U.S.C. § 1409(a).

E.G. and Randy Kendrick ("the Kendricks") filed this complaint to determine the dischargeability of their claim against debtor Richard Pleasants ("Pleasants") pursuant to 11 U.S.C. § 523. Pleasants is the president and sole shareholder of Pleasants & Associates, Inc. ("P & A"), an architectural design and construction firm, which the Kendricks hired to perform restorations on their Alexandria, Virginia home.

The Kendricks first met Pleasants in late 1988 or early 1989 while Mrs. Kendrick was pricing weather shield windows for an addition they planned to build on their home. A friend of Mrs. Kendrick, who had just purchased windows, recommended Pleasants as a window distributor. At Pleasants's request, Mrs. Kendrick brought to P & A's office the architectural plans for the addition drawn by an architect in Texas. Upon looking at these plans, Pleasants pointed out various technical problems with them. Puzzled that a window salesperson would know so much about architectural plans, Mrs. Kendrick inquired about Pleasants's occupation. Pleasants responded that he was an architect educated at Dartmouth and the University of Virginia's architectural school.

At the end of their discussion, Pleasants suggested he come to the Kendricks' house and look at the site. He recommended that he do a series of drawings outlining their

architectural options. Impressed by Pleasants's accomplishments at such a young age, Mrs. Kendrick put the original plans aside and paid Pleasants monthly for these new drawings, totaling approximately $35,000 over five years.[1]

On September 17, 1993, the Kendricks solidified this arrangement with Pleasants by entering into a preliminary agreement with P & A ("the Design Contract"). P & A was hired to prepare certain preliminary design work and construction estimates necessary to determine the cost of renovating their home. In addition, the contract required P & A to furnish the project design and to develop a three-phase design schedule.

After some delay and months after construction had already begun, the Kendricks entered into an "Agreement and General Conditions Between Owner and Pleasants & Associates, Inc." ("the Construction Contract") on April 25, 1994, whereby P & A agreed to construct certain renovations and additions to the Kendricks' home.[2] The contract required P & A substantially to complete the project by October 30, 1994. The project was nowhere near completion by that date.[3]

In light of this delay, coupled with P & A's requests for additional compensation and the deteriorating condition of the house, the Kendricks hired an independent consultant named Frank L. Reifsnyder ("Reifsnyder") of Construction Dynamics Group, Inc. ("CDG") in March of 1995 to assist in evaluating the project's status.[4] Reifsnyder revealed his suspicions concerning Pleasants's lack of education and training, as well as being licensed as an architect, shortly thereafter. The Kendricks then confirmed these suspicions with the proper authorities that Pleasants had misrepresented these things.

In June of 1995, the Kendricks told Pleasants that they planned to sue him for breach of contract and fraud. Pleasants responded by letter dated June 22, 1995 apologizing and asking for a second chance to complete the project. The Kendricks gave him that chance, but only under Reifsnyder's supervision.

The resulting agreement was the Forbearance Agreement dated July 17, 1995 signed by Pleasants on behalf of P & A and as guarantor. In this agreement the Kendricks were to forbear from declaring P & A in default, from terminating the Construction Contract and the Design Contract and from pursuing any remedies they had against P & A and Pleasants. The agreement also outlined nine "milestones", which set a due date for different goals toward completion of the project.

Eventually, P & A breached the Forbearance Agreement by not meeting a single milestone. The Kendricks fired Pleasants and P & A on October 5, 1995. The Kendricks notified Pleasants via letter on October 13, 1995. On February 12, 1996, Pleasants sent the Kendricks a written demand for payment. The Kendricks filed suit in Fairfax Circuit Court on April 4, 1996 for fraud, breach of contract and negligence. The jury trial was scheduled for April 14, 1997. Pleasants filed for bankruptcy on P & A's behalf on April 11, 1997, as well as in his personal capacity on May 21, 1998.

The Kendricks filed this adversary proceeding on August 27, 1997 seeking to have

---

**1.** During this time, Pleasants became the Kendricks' friend, even twice visiting them in Arizona with his fiancée.

**2.** Pleasants executed a personal guaranty of the Construction Contract on June 1, 1994. The Design Contract therefore was amended effective as of that date.

**3.** Mrs. Kendrick testified that she confronted Pleasants with her concern that he was taking on too much, and asked if the project would lose the balance between architect and contractor if he worked both jobs. Pleasants responded that his professional responsibility as an architect was so strict that he would risk his entire career if he ever specified that something was built and it was not. It appeared to Mrs. Kendrick that he wanted control over the integrity of the entire project, since his license was at risk.

**4.** Mrs. Kendrick and Christy Smith, her sister who was living in the house at the time Pleasants started the renovations, both testified that pipes had frozen and burst, walls had been demolished and water flowed in every room of all three stories of the house. Reifsnyder further testified as to the structural problems plaguing the construction and the inadequacies of Pleasants's plans.

this Court find their claim nondischargeable pursuant to 11 U.S.C. § 523(a)(6). The Court held a two-day trial on December 2nd and 10th, 1998. At trial, the Kendricks claimed Pleasants intentionally led them to believe he was a licensed architect, that Pleasants knew the Kendricks would justifiably rely on his representations and in fact did and that the Kendricks would have never employed Pleasants had they known of his misrepresentation. The amount of the Kendricks' claim against Pleasants's estate is $1,262,296.16, as was stipulated to by parties' counsel and the Chapter 7 trustee, H. Jason Gold.

On December 15, 1998, the Kendricks filed a motion to amend their complaint to conform to the evidence proven at trial to include a cause of action pursuant to 11 U.S.C. § 523(a)(2)(A). The Court heard parties' arguments on January 26, 1999 and granted plaintiffs' motion in open court.[5] Because we find Pleasants's misrepresentations fulfill the requirements of section 523(a)(2)(A), the Court declines to address the more difficult analysis of what constitutes "willful and malicious" under section 523(a)(6).

■ Section 523(a)(2)(A) of the Bankruptcy Code provides an exception to discharge available to the otherwise honest but unfortunate debtor, and states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A); *see Grogan v. Garner,* 498 U.S. 279, 282–89, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (Congress did not favor "the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud"); *Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988). In order to succeed in their claim under section 523(a)(2)(A), the burden rests on the Kendricks to prove by a preponderance of the evidence:

(1) that debtor made representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made.

*Grogan,* 498 U.S. at 288, 111 S.Ct. 654; *Household Fin. Corp. v. Kahler (In re Kahler),* 187 B.R. 508, 511–12 (Bankr.E.D.Va. 1995).

■ A misrepresentation consists of any words or conduct, which produce a false or misleading impression of fact in the mind of another. *See, e.g., Longo v. McLaren (In re McLaren),* 3 F.3d 958, 961 (6th Cir.1993); *Insurance Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108 (3rd Cir.1995). An omission may constitute a misrepresentation where the circumstances are such that the omission creates a false impression, as section 523(a)(2)(A) does not require an overt misrepresentation. *Kahler,* 187 B.R. at 512; *see Peterson v. Bozzano (In re Bozzano),* 173 B.R. 990, 993–94 (Bankr.M.D.N.C.1994), abrogated on other grounds, *Cohen v. De La Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *Central Bank v. Kramer (In re Kramer),* 38 B.R. 80, 82 (Bankr. W.D.La.1984); *see also Community Hosp. of Roanoke Valley, Inc. v. Musser (In re Musser),* 24 B.R. 913, 918 (W.D.Va.1982).

Several witnesses testified Pleasants represented himself as an architect or allowed the Kendricks to introduce him as such.[6]

---

**5.** Courts that have noted the overlap of sections 523(a)(2)(A) and (a)(6) "have either applied both provisions to fraud claims or have indicated an inclination to do so." *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 857 (1st Cir.1997); *see also Ferris v. Stokes (In re Stokes),* 995 F.2d 76, 77 (5th Cir.1993) ("a number of courts have suggested that the same conduct can violate both provisions") (per curiam) (citing cases).

**6.** Diane Whitehead, a friend of the Kendricks, testified Mrs. Kendrick introduced her to Pleasants as an architect while at a dinner party,

Pleasants's administrative assistant, Ms. Causby, stated at trial she also thought Pleasants was an architect by the degrees on his office wall and the architectural plans he showed her during her interview. Mrs. Kendrick further claimed when billed for work performed by both a principal and assistant architect, she thought Pleasants was the principal architect and Mr. Crane the assistant, given these two were the only people she had met at P & A.

■ Furthermore, the Court did not find credible Pleasants's testimony denying he ever affirmatively represented himself as an architect. However, even assuming Pleasants did not overtly misrepresent himself, Pleasants testified at trial that over time he began to realize people thought he was an architect.[7] Pleasants did nothing to correct this misconception. This conduct clearly constitutes a misrepresentation under section 523(a)(2)(A). *See McDaniel v. Border (In re McDaniel)*, 181 B.R. 883, 886–87 (Bankr. S.D.Tex.1994); *Bozzano*, 173 B.R. at 993–94.

■ Section 523(a)(2)(A) also requires debtor to have knowingly made false representations with the intent to deceive the creditor. 11 U.S.C. § 523(a)(2)(A). Since the Court seldom has direct evidence of fraudulent intent, we must usually resolve the question of intent by an examination of surrounding circumstances. *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 465 (Bankr.E.D.Va.1992). Intent to deceive may be inferred if defendant knowingly or recklessly made false representations, which he should know will induce another to rely on them. *Id.*

■ P & A's letterhead, business cards, advertisements and signs all state "Pleasants & Associates, Architectural Design and Construction" and Pleasants listed the company in the phone book under "Architects" in 1996 and 1997.[8] Pleasants knew he was not an architect, as he had not received any of the requisite training or education. Yet, he intentionally held himself and P & A out as such in hopes of soliciting architectural business.

The United States Supreme Court has ruled in an action under 11 U.S.C. § 523(a)(2)(A) a creditor need only prove a party justifiably relies on debtor's misrepresentation. *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Professional licenses carry with them a degree of presumed competence, especially in an area such as architecture, which requires years of schooling, training and the passing of an arduous examination.[9] *McCain v. Fuselier (In re Fuselier)*, 211 B.R. 540, 545 (Bankr. W.D.La.1997) (nondischargeable under section 523(a)(2)(A) because defendant use presumption that he had a contractors license to convince plaintiffs to hire him). The Court therefore finds credible the Kendricks' testimony that they would not have hired anyone but an architect to work on their home.[10]

---

where she got into a long discussion about architecture and schools. Beverly Champeau, Mrs. Kendrick's brother's mother-in-law, and Marlene Carlson and Margaret Manor, Mrs. Kendrick's sister's friends, also testified as to similarly being introduced to Pleasants at a Fourth of July picnic at the Kendricks' home.

7. In a letter to the Kendricks dated June 22, 1995 admitted as evidence at trial, Pleasants requested a second chance and stated:

Despite the fact that I never directly represented myself as such, it was dishonest and morally wrong of me to allow this misunderstanding to continue, and for that I am truly sorry. I know that it has been an ongoing perception by most people that I am a registered architect as a result of the work we perform and is reinforced by my active role in the design and execution of our projects.

8. Pleasants's own expert witness did not feel P & A should call themselves an architectural firm

even if Pleasants had an architect on staff. The testimony stated as follows:

Court: Now, if you were to list in the—in your letterhead or on your office Thomas L. Kerns & Associates, Architects and you were not an architect, but had an architect on staff, a licensed architect, would that be a proper way to proceed or a proper way to do it?

Mr. Kerns: In my mind, that would not be proper, no.

9. In order to become a licensed architect, a person must earn a degree from an accredited architecture school, complete a three-year apprenticeship program under a licensed architect and then pass a week-long 40–plus hour examination.

10. In fact, Mr. Kendrick testified he thought there was value in hiring well-qualified professional people who have earned specific creden-

The facts of the case at bar are strikingly similar to those in *McDaniel v. Border (In re McDaniel)*, 181 B.R. 883 (Bankr.S.D.Tex.1994). The parties in *McDaniel* entered into a contract where McDaniel was to perform certain architectural work on Border's townhouse. The Texas bankruptcy court found that McDaniel held himself out as an architect in his dealings with Border based on several facts also in existence in this case. He gave her a business card listing "architectural services" and described himself as the architect on the job. *Id.* at 885. Border also introduced McDaniel as an architect to her long-term friend without a correction of this misconception. *Id.* Despite McDaniel's denials, the court found these facts sufficient to support nondischargeability pursuant to section 523(a)(2)(A). So we find in the case at bar.

Pleasants makes several arguments in an attempt to refute liability. Pleasants first argues the Kendricks have failed to show his misrepresentations have proximately caused their damages.[11] *See, e.g., Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 852 (Bankr.E.D.Va.1986). Pleasants misses the point when he states his failure to perform the work only implicates a breach of a construction contract claim. Section 523(a)(2)(A) has been interpreted to make nondischargeable the "loss or damage sustained by a creditor as a result of being induced into virtually any type of business transaction by fraud, false representations or false pretenses on the part of the debtor." *Bozzano*, 173 B.R. at 992; *see Morlang v.*

*Cox*, 222 B.R. 83 (W.D.Va.1998). Mr. Reifsnyder testified Pleasants operated under incomplete plans, and structural problems and code violations plagued the project.[12] The Court finds it is because Pleasants misrepresented his credentials, thereby inducing the Kendricks to hire an unqualified firm, that he was unable to complete the work.[13]

The North Carolina bankruptcy court dealt with this very issue in a case where a builder, who lacked the requisite contractors licenses, made misrepresentations that induced plaintiffs into purchasing a home. *Bozzano*, 173 B.R. at 994; *see Cox*, 222 B.R. at 85–86 (sufficient causal relationship existed between defendant's fraudulent misrepresentation and damages incurred). That court concluded from the numerous problems with the home ranging from flooding to the lack of support columns in the basement that these defects "established, because of their number and magnitude, that defendant was not qualified to be the general contractor for a large residence of the type involved in this case...." *Bozzano*, 173 B.R. at 994.

Although Bozzano, like Pleasants, tried to protest that he never affirmatively stated to the Petersons that he was a licensed general contractor and that they never asked him if he had a license, the court found Bozzano had an affirmative duty to disclose information about his qualifications. *Id.* at 994–95. Bozzano's failure to disclose caused the Petersons' damages. *Id.* We find the facts in the case at bar support the same conclusion.

---

tials and have completed rigorous training programs. He stated he wanted the very best and was willing to pay for it.

**11.** Though parties stipulated the amount of damages, thereby reducing the number of days scheduled for trial, Pleasants urges the Court to limit the Kendricks' claim to those amounts received by him under the contract. We decline to thwart parties' agreement, given no reason under the law to do so. *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1219, 140 L.Ed.2d 341 (1998) (nondischargeability applies to "any debt" related to the fraud); *Morlang*, 222 B.R. at 86; *Bozzano*, 173 B.R. at 998. This amount appropriately includes the cost of repairing Pleasants's inadequate work and completing the project, living expenses incurred by the Kendricks' family when they were forced out of the house for over three

years, certain attorneys' fees and punitive damages as agreed to by the parties. *Cohen*, 523 U.S. at 219–21, 118 S.Ct. at 1218–19.

**12.** For instance, Mr. Reifsnyder testified as to the structural unsoundness of the master bedroom roof. Apparently, Pleasants failed to erect columns in order to carry the load of the roof to the foundation, thereby creating a threat to whoever stood in the room.

**13.** Pleasants also argues he had a licensed architect on staff, who performed the actual work on the Kendricks' project. However, defendant never came forward with definitive evidence to this effect. Pleasants's employee, Mr. Crane, went to architectural school and works as an intern architect, but is not a licensed architect.

Pleasants further asserts the Kendricks waived their claims of fraud by entering into the Forbearance Agreement. *See FWB Bank v. R.S.Q.*, No. 119209, 1993 WL 946019, at *1 (Va. Cir. Ct. March 25, 1993). He cites to certain recitals in the agreement that focus on the Kendricks' rights in connection "with any breach" as pointing to their intention to limit their claims against him to breach of contract.[14] Waiver is the voluntary, intentional abandonment of a known legal right, advantage or privilege. *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699, 707 (1987); *Employers Ins. Co. v. Great Am.*, 214 Va. 410, 200 S.E.2d 560, 562 (1973); *Coleman v. Nationwide Life Ins. Co.*, 211 Va. 579, 179 S.E.2d 466, 469 (1971). The Court fails to see, even under the most liberal construction of this agreement, how the Kendricks have waived their fraud claim.

Furthermore, Mr. Kendrick testified as to his aversion to litigation. He stated, as a self-made businessman, that he preferred to give people every opportunity to perform under a contract. He estimated it would cost more to bring someone new to the project than if they permitted Pleasants to complete the project. The Kendricks therefore saw the Forbearance Agreement as a way to minimize their damages, while giving Pleasants the second chance he requested.

In addition, the facts do not support a finding that the Kendricks ratified Pleasants's fraud by continuing under the contract for four weeks and allowing two months to elapse before executing the Forbearance Agreement. *Reynolds Jamaica Mines, Ltd. v. La Societe Navale Caennaise*, 239 F.2d 689, 694 (4th Cir.1956); *Link Assocs. v. Jefferson Std. Life Ins. Co.*, 223 Va. 479, 291 S.E.2d 212, 216 (1982). As Mrs. Kendrick's

sister testified, Pleasants was not even conducting any work on the project. She stated at trial that periods elapsed when nothing seemed to be getting done. Regardless, the Court does not find the passing of this amount of time constituted ratification, given the circumstances of this case. *Link*, 291 S.E.2d at 216 (delay in action does not amount to waiver, if delay results from a reasonable expectation that relief will be forthcoming); *White v. American Nat'l Life Ins. Co.*, 115 Va. 305, 78 S.E. 582, 583 (1913).

Pleasants also argues the Kendricks' counsel undertook a due diligence investigation of Pleasants and P & A when he contacted the Virginia State Corporation Commission to verify P & A's incorporation. Pleasants claims the Kendricks therefore are charged with all knowledge they could have obtained from a complete investigation. *See, e.g., Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1263 (4th Cir.1993). However, a duty to conduct a due diligence investigation only arises when one has notice of facts sufficient to put them on notice, and those facts, if pursued with due diligence, would lead to knowledge of other facts. *Id.*; *see Maine v. Leonard*, 365 F.Supp. 1277, 1281 (W.D.Va.1973).

Mr. Grady Carlson of Hunton & Williams, the Kendricks' counsel at the time the parties executed the contract, testified that his firm always contacts the Virginia State Corporation Commission to verify the spelling of the company's name with whom their client is about to do business. He also stated his firm contacted the Virginia State Contracting Board in this case to see if P & A held a valid Class A contractors license, since P & A was conducting contracting work under the

---

**14.** Pleasants cites to the following provisions of parties' forbearance agreement:

P & A and the Guarantor have requested that the Owner forbear from (a) declaring the Contractor in default and terminating the Construction Contract and the Design Contract, and (b) pursuing any remedies the owner may have against P & A and the Guarantor. The Owner has agreed to do so, subject to the terms of this Agreement.

Paragraph 1(a) further states:

Subject to the terms and conditions set forth herein, the Owner agrees to refrain until Au-

gust 16, 1995 (as the same may be adjusted from time to time, the "Initial Forbearance Date") from terminating the Construction Contract or the Design Contract or pursuing or instituting any of their remedies, legal or equitable, against P & A (such rights and remedies referred to herein as the "Forbearance Rights") in connection with any breach by P & A of any term or condition set forth in the Construction Contract or the Design Contract which is known to the Owner on the date thereof.

agreement.[15] Carlson claimed he did not check Pleasants's licensure as an architect because he had no reason to do so and his inquiry into the other matters did not give rise to such a need. *See, e.g., Cooke,* 998 F.2d at 1263. As a result, we find that at the time the Kendricks entered into the contract with P & A, Hunton & Williams had not been apprised of the possibility of Pleasants's misrepresentation, which would have given rise to a duty to investigate further.

Pleasants tries to cloud the issue by citing to a Virginia statute that allows work such as that as was supposed to be performed on the Kendricks' house to be done by someone who is not a licensed architect. *See* Va.Code Ann. § 54.1–402(a); *see, e.g., Greenwald Cassell Assocs., Inc. v. Department of Commerce,* 15 Va.App. 236, 421 S.E.2d 903, 905 (1992). We find this irrelevant, as Pleasants knowingly misrepresented himself as an architect with the intent for the Kendricks to rely on his representations and the Kendricks relied on his representations to their detriment. Whether or not Virginia law required an architect to do the Kendricks' renovations, Pleasants's conduct meets the elements of section 523(a)(2)(A).

We find the Kendricks have established by a preponderance of the evidence that Pleasants made false representations concerning his professional status as an architect with the intent of deceiving the Kendricks and that the Kendricks justifiably relied on Pleasants's representations to their detriment. For the foregoing reasons, the Court deems the Kendricks' stipulated claim for $1,262,296.16 as nondischargeable pursuant to section 523(a)(2)(A). The Court will enter a separate order consistent with this opinion.

15. The Kendricks did not contact Mr. Carlson until late 1993, months after the parties had signed the Design Contract. Hunton & Williams was asked only to perform work related to the Construction Contract. Mr. Carlson therefore would have had no reason to inquire as to P & A's architectural licenses.