**In re Silton R. FUSELIER, Jr.,
Robin A. Fuselier, Debtors.**

**Jonathan D. McCAIN, Kathy Dugas
McCain, Plaintiffs,**

**v.**

**Silton R. FUSELIER, Jr., Defendant.**

**Bankruptcy No. 96BK–20924.
Adversary No. 97AP–2001.**

United States Bankruptcy Court,
W.D. Louisiana,
Lake Charles Division.

Aug. 5, 1997.

James P. Gaharan, Jr., Lake Charles, LA, for Debtors.

Robert W. Daigle, Lafayette, LA, for Plaintiffs.

## REASONS FOR DECISION

HENLEY A. HUNTER, Chief Judge.

This matter came before the Court on the trial on the merits of the complaint of the plaintiffs, which request that certain debts be declared nondischargeable in this bankruptcy case. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local Civil Rule 83.4 incorporated into W.D. La. LBR 9029–3. No party at interest has sought to withdraw the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these reasons there will be judgment in favor of the plaintiffs against the defendant.

## FACTUAL BACKGROUND

The Debtor, Silton Fuselier, Jr., moved to Lafayette, Louisiana, in August of 1992. The Debtor's father, Silton Fuselier, Sr., had been a carpentry sub-contractor for many years, and had worked with Dugas Construction Company, a Lafayette contractor, in the past. Following Hurricane Andrew, Debtor began working for Dugas directly, as a carpenter and roofing subcontractor. This relationship continued until 1995, when the Debtor accepted a project on his own: to build the plaintiffs' residence.

The Debtor and the McCains met "among friends". Discussion ensued concerning the McCain's desire to construct a residence at 201 Fabre Road, Broussard, Louisiana. The Debtor approached J.C. Dugas, the owner of Dugas Construction, about the McCain project. Mr. Dugas stated in his deposition that he understood that Dugas Construction would present a proposal on the McCain

residence. Mr. Dugas wrote a proposal and gave it to the Debtor to present to the McCains. The Debtor was to be the carpentry subcontractor on the project. The Debtor did not present this proposal to the McCains as the proposal of Dugas Construction Company, evidently because the Debtor wanted this project for himself.

The Debtor took the Dugas proposal and retyped it, changing only the letterhead to "Fuselier Construction". See plaintiffs' exhibits # 1 & 2. In addition to plagiarizing Dugas' proposal, the Debtor placed J.C. Dugas' contractor's license number at the end of the contract, without his consent. The price on both proposals was $114,250.00.

The proposal was accepted, and then signed by plaintiffs and the Debtor. Jonathan D. McCain testified that his construction lender required that the general contractor on the project have a contractor's license, unless special authorization was obtained for the borrower to self-contract the project. The parties stipulated to the following facts relative to the Debtor's licensing:

1. The Debtor represented to the McCains that he was a licensed contractor in the State of Louisiana;

2. The Debtor represented to the McCains that he possessed Contractor's License No. 17176 and inserted the number in the construction contract;

3. License No. 17176 belongs to Dugas Construction Company[1], who did not consent to the Debtor's utilization of the license number in connection with the McCain project; and

4. The debtor has never possessed a contractor's license in the State of Louisiana.

The plaintiffs kept a log of the work done on their home. Mr. McCain testified that work actually began on the home on June 2, 1995. The slab was poured over the next few days, with the framing taking place around the middle of June. During the course of the framing, problems with the foundation were discovered. The appropriate "base plates"

1. License No. 17176 is actually in the name of

J.C. Dugas, rather than his company's name.

could not be nailed to the uneven foundation without bending the wood. Rainwater flooded parts of the kitchen area. A large ridge of concrete protruded through the entire area of the house. Experts examining the slab determined that a soused concrete mixture had been poured in an inconsistent or uneven manner. See plaintiffs' exhibit # 10, p. 2. The Debtor admitted that there were problems with the slab, and that this was his first job as a general contractor. Ultimately, Debtor's services were terminated. The slab had to be demolished, and a new one built. The framing that had been completed had to be taken down. Only seventy-five percent of the lumber could be reused. The McCains completed the house, acting as their own contractor, due to their having insufficient funds to hire another contractor after paying Debtor for his unsatisfactory work.

Debtor admits that some of the money paid to him by the McCains was used for purposes unrelated to the construction of the residence. Materialman's liens were filed against the residence by Angel Concrete, Inc. and Doug Ashy, the lumber supplier. The McCains paid $8,171.65 to Mr. Ashy for a lien waiver. Angel is still owed $2,285.06. The plumber who performed the "plumbing rough-in" was also not paid by the Debtor.

The McCains have paid the Debtor a total of $29,906.50. On June 1, 1995, the McCains gave the Debtor a $2,000.00 check. On June 9, the Debtor deposited this check into his business checking account. On June 9, the McCains and the Debtor obtained a "draw" against the construction loan of $21,972.50. On June 12, 1995, the Debtor deposited only $17,972.50, withholding $4,000 for some unknown purpose.[2] On June 2, a $5,934 check was given to the debtor. On June 26, the Debtor deposited $4,434.00. On June 30, the debtor deposited $2,300 into his account, which is not traceable to the McCains. These transactions constitute all of the Debtor's deposits into his business account from June 1 to June 30, 1995. See Defendant's Exhibit # 1. The Debtor's account was over-

drawn on May 31, June 1, June 6, June 7, June 8, June 27, and June 28, 1995.

The Debtor offered fuzzy explanations, at best, as to why some of the McCain money was not deposited into his account and some of the suppliers and laborers were not paid. Debtor testified that he "robs Peter to pay Paul" in his business, and that this is a regular practice in his industry. Prior to the large draw on the construction loan, the Debtor told the plaintiffs expressly that the draw was needed to pay for supplies that had already been delivered and used in the construction. However, $4,000.00 of this draw never made it to the Debtor's account. Some of the money was diverted by Debtor to pay worker's compensation insurance and labor on other projects. Both the Debtor and the plaintiffs agree that workers were sometimes taken off the McCain project by the Debtor to go work on other projects, despite billing the McCains for their services.

## PROCEDURAL HISTORY

After the construction contract was terminated, the Debtor filed a Mechanic's lien against the residential property, contending that he was entitled to anticipated profits from the project. The McCains sued for cancellation of the lien, and the state court granted relief, assessing costs and attorneys fees in the amount of $900 against the Debtor. The McCains sued the Debtor in state court for damages resulting from breach of contract and fraud. The 15th Judicial District Court, State of Louisiana, rendered judgment in favor of the plaintiffs, in the amount of $45,427.67, on September 16, 1996. This judgment is claimed to be non-dischargeable by the plaintiffs. The Debtor filed for relief under Chapter Seven of the Bankruptcy Code on October 9, 1996, a mere seven days before the McCain's judgment became executory. This adversary proceeding was filed on January 6, 1997.

## CONCLUSIONS OF LAW

The burden of proof in an action under 11 U.S.C. § 523 is preponderance of

---

**2.** The plaintiffs suggest that the Debtor used this $4,000 to help pay for a new automobile for his

personal use.

the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To prove fraud under § 523(a)(2)(A), the creditor must establish the following elements:

(1) The debtor made a representation;

(2) The debtor knew that the representation was false when it was made;

(3) The representation was made with the intention and purpose of deceiving the creditor;

(4) The creditor justifiably relied on such representations;

(5) The creditor sustained the alleged loss or damage as the proximate result of the representations having been made.

*In re Miller,* 5 B.R. 424 (Bkrtcy.W.D.La. 1980), *In re McDaniel,* 181 B.R. 883, 886 (Bkrtcy.S.D.Tx.1994). This exception to discharge requires that the creditor demonstrate justifiable reliance on his part, and not reasonable reliance, on a debtor's fraudulent misrepresentation. Justifiable reliance is essentially reliance in fact, and does not require investigation by the creditor to make the reliance justifiable. Reasonableness is not irrelevant, however, "... for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Field v. Mans,* 516 U.S. ——, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351, 365 (1995).

■ In this case, the Debtor made two misrepresentations to the McCains: (1) that he was in fact a licensed contractor, and (2) that payments made by the McCains to him would be used for the costs of construction. By the Debtor's own admissions, these representations were false at the time he made them. The lack of a contractor's license has been stipulated by the Debtor. The Debtor's testimony about "robbing Peter to pay Paul", and his exhibit reflecting his overdrawn checking account during the McCain project, clearly show the Debtor's knowledge of the falsity of the second statement.

This Court is quite disturbed by the Debtor's testimony that "robbing Peter to pay Paul" is a typical practice of contractors. The court in *In re Dobbs,* 115 B.R. 258, 266 (Bkrtcy.D.Idaho 1990), stated:

"The fact that it is apparently common for residential building contractors in the Boise area to "rob Peter to pay Paul"... should not insulate the builder from a claim of fraud unless the practice is clearly disclosed to or understood by the perspective customers. That is, it is not as important that the diversion of funds is sanctioned by the local industry as it is that the public in general [is] unaware of this fact."

There is no evidence that the practice described by the Debtor is common. If it is, this Court will not vindicate a fraudulent practice, no matter how rampant or "accepted".

The Debtor's scienter is also proven. The McCain project was the Debtor's first undertaking as a general contractor. He represented that he was licensed to convince the McCains to hire him. While the Debtor maintains that he fully intended to build the McCains a good house, this Court will not countenance a "good heart but empty head" defense. Clearly, Debtor lacked the expertise and fiscal responsibility to act as contractor for this project.

Additionally, the requests by the Debtor for cash from the McCains were accompanied by explanations of what costs and labor needed to be paid. However, the Debtor could not have had a good faith belief that he would use the money to solely pay expenses and costs of the McCain construction. The overdrawn checking account and cash flow problems in the month of June, 1995, clearly vitiate any good faith on the part of the Debtor. The Debtor needed money to pay his workers, insurance costs, and other expenses unrelated to the McCain project. He made false representations to get that money from the plaintiffs. The *Dobbs* Court reached similar conclusions about a debtor/contractor who asked for and received a construction draw immediately prior to filing bankruptcy. *Id.* at 268–69. When a contractor's ship is sinking, he may not, in good faith, continue to accept money from his customers who expect the contractor to pay expenses related to their respective projects.

This Court finds the testimony of Mr. McCain convincing as to their justifiable reliance upon Mr. Fuselier's representations.

The presentation of a contractor's license number of the project proposal is sufficient for the McCains to expect that the Debtor was a competent contractor, and was in fact licensed. Nothing the Debtor said or did prior to the signing of the contract would raise any reason for the McCains to check his qualifications. The case of *In re Bozzano*, 173 B.R. 990, 994–995 (Bkrtcy.M.D.N.C. 1994), states that licensing touches on the essence of the construction transaction, and that the contractor/debtor has the affirmative duty to disclose his lack of a contractor's license. That court held that a plaintiff's reliance on a debtor's non-disclosure was reasonable. The affirmative representation of licensed status makes the McCain's reliance all the more reasonable.

The plaintiffs have also shown justifiable reliance on the Debtor's misrepresentations that induced them to make interim payments. Construction was occurring on the residence. A slab had been poured, framing had been partially completed, and workers had been seen on the job site on a daily basis. Additionally, the Debtor and the McCains signed a document titled "Construction Draw Procedure". See plaintiffs' exhibit # 6. That document states that draw requests will be granted by the bank only for work done and materials used on the residence under construction. The representations made by the Debtor that accompanied the requests for money were justifiably relied upon by the McCains; " ... the common sense interpretation of the terms of the contract is that the [plaintiff's] payments would only be used for goods and services provided to him and not to another." *Miller,* 5 B.R. at 428. *See also Dobbs, supra* at 266.

The Debtor contends that licensure was not material to the plaintiffs' decision to contract with him based on the fact that, subsequent to the Debtor's termination, Mr. McCain acted as his own contractor. This argument is specious. However, Mr. McCain testified that, because of the funds paid to the Debtor, he was unable to afford a new contractor. The McCains paid the Debtor almost $30,000, and then had to pay an additional $32,000 to demolish the slab and rebuild the house to the state of completion prior to the Debtor's termination. Mr. McCain had to pay for the same work twice, due to the Debtor's fraud.

Additionally, the Court notes that the parties to this case have presented similar arguments about an alleged representation that the Debtor was bonded for this project. This representation is alleged to be purely verbal. Some of the discussions about a bond took place after the contract was accepted and construction began. In all other respects, the testimony and evidence follows roughly the same pattern as that relative to the license. The Debtor raises the same materiality defenses as raised against the plaintiffs' licensing arguments.

The evidence supports the conclusion that Debtor at least represented to the plaintiffs that he could obtain a bond, if required. Nothing in Debtor's history suggests that he could be or had ever been bonded. Finally, we find Debtor's entire demeanor throughout the trial to be evasive. His testimony was frequently contrary to the pre-trial stipulations made by his counsel. While the bond may have been less of a material concern than the license to the McCains, or the proper use of the funds they paid Debtor, the Debtor's representations relative to the bond was made in the course of a fraudulent scheme being perpetrated by the Debtor.

The remaining issue under the § 523(a)(2)(A) inquiry is quantum. The state court was presented with the same facts as adduced by the stipulations and evidence presented to this Court. See plaintiffs' exhibit # 12. That court determined that the damages suffered by the McCains at the hands of the Debtor are recoverable in the amount of $45,427.67. This judgment is non-dischargeable *in toto* if these damages were proximately caused by the Debtor's fraud.

In the case of *In re McDaniel, supra,* the debtor held himself out to be a licensed architect, when in fact he was not. The remodeling of a townhouse, which he supervised, contained numerous defects. That court held that the damages resulting from the defects were proximately caused by the debtor's misrepresentations.

"In connection with § 523(a)(2)(a) plaintiff has established by a preponderance of the

evidence that McDaniel made false representations to Broder that he was an architect with the intent of deceiving her, she relied to her detriment on those representations and suffered injury as a result." *McDaniel*, 181 B.R. at 887.

The case of a contractor is no different. Professional licenses carry with them a degree of presumed competence. The Debtor used this presumption to convince the McCains to hire him. In fact, the Debtor falsified documents and misrepresented his expertise and fiscal responsibility. But for the Debtor's misrepresentations, the McCains would not have hired him, and would not have had an unsound construction. Therefore, the Court finds that all of the McCains' damages are nondischargeable under § 523(a)(2)(A).

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ADJUDGED THAT** the debt owed by the Debtor to the plaintiffs, Jonathan D. and Kathy Dugas McCain, as recognized in the judgment of the 15th Judicial District Court, State of Louisiana, dated September 16, 1996, is nondischargeable under 11 U.S.C. § 523.

**SO ORDERED.**