In re Glenn J. MELCHER and Lynette B. Melcher, Debtors.

Deborah Davis, Plaintiff,

v.

Glenn J. Melcher, et al., Defendants.

Bankruptcy No. 02–01803.
Adversary No. 02–10153.

United States Bankruptcy Court,
District of Columbia.

Oct. 28, 2004.

Gregory P. Johnson, for plaintiff.

Madeline A. Trainor, Alexandria, VA, for defendant.

*DECISION RE MOTION TO DISMISS COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT*

S. MARTIN TEEL, JR., Bankruptcy Judge.

For the reasons that follow, the court will dismiss this nondischargeability pro-

ceeding pursuant to the defendants' Motion to Dismiss Complaint, or in the Alternative, for Summary Judgment. The defendants, Glenn J. Melcher and Lynette B. Melcher, each received a discharge under § 727 of the Bankruptcy Code (11 U.S.C.) as the debtors in the bankruptcy case in which this adversary proceeding is brought. The plaintiff, Deborah Davis, has failed to show that her damage claims against the Melchers are excepted from the effects of those discharges under either of the exceptions she relies upon, 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).[1]

In her complaint, Davis alleges that the Melchers engaged in fraud in obtaining permits for the renovation of their home, after which the contractor undertook the renovations in a manner that resulted in physical damage to the Davis' adjacent home which shared a common party wall and had a common foundation, and an encroachment over her property line. (Davis alleges that the construction damaged her home's foundation and shared wall, and that the projection beyond the Melchers' existing building line resulted in encroachment of the Melchers' extended wall over her property line.) Davis' § 523(a)(2)(A) claim (that the debt owed her is for property obtained by fraud) fails because the Melchers obtained no property from Davis, because the proximate cause of the harm to Davis was not the fraudulent procurement of the building permits but failure of the Melchers' contractor to perform construction of the renovation in a proper manner to avoid damage to Davis, and because there was no justifiable reliance on certain representations relating to the permits. Her § 523(a)(6) claim (that the debt is one for willful and malicious injury by the Melchers to her property, based on the building applications having been procured by fraud) fails because Davis has failed to rebut the Melchers' affidavits which establish that they did not conduct any of the actual construction work that led to Davis' home being damaged, and that they were unaware of any fraud in the building permit applications submitted on their behalf by their contractor; moreover, even if they had known of the fraud, that is insufficient to establish that they knew that the injuries to Davis' property were substantially certain to occur because of that fraud. They thus did not intend to injure Davis' property.

## I

The court first addresses the factual background.[2] Davis lived next door (in an attached townhouse) to a townhouse property owned and being renovated by the

---

1. 11 U.S.C. § 523(a) provides in relevant part:

   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

   ...

   (2) for money, property, services ... to the extent obtained, by—

   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition; [or]

   ...

   (6) for willful and malicious injury by the debtor to another entity or property of another entity.

2. Except for facts that have been established by affidavit in the Melchers' favor for summary judgment purposes (under the familiar test of viewing all the affidavits of record in the light most favorable to Davis), the facts for purposes of deciding the Melchers' motion are established by the complaint's well-pled allegations of fact (which are assumed to be true). As will be seen, however, many of Davis' "factual" contentions are assertions of legal conclusions that are demonstrably incorrect.

Melchers.[3] The Melchers' renovations were done pursuant to building permits obtained by false representations, and the renovations caused extensive damage to Davis' home. Specifically, the Melchers hired Eric Frolia, a contractor who was not licensed in the District of Columbia, to rebuild and expand their home, and he performed the work in an incompetent fashion, causing the damage to Davis' property.

### A.

The complaint points to three applications for building permits that were false.

### 1.

Although construction began in September of 1999, Frolia failed to apply on the Melchers' behalf for a construction permit for the renovation until November 5, 1999. This application contained a number of false statements and failed to disclose the true nature of the construction.

First, the work was described as "interior only" and disclosed the number of stories as "two," despite the fact that a new third floor was being constructed.[4] However, the building permit itself stated:

Permission is hereby granted to

**Glenn & Lynette Melcher**

who [are] authorized to perform the work described herein at the address shown above in strict accordance with the conditions stated on BOTH sides of this permit[.] Authorized work and conditions of performance thereof[:]

**3.** Davis bought the property in question from the Melchers after the bankruptcy case was commenced; however, the lawsuit is for damage to Davis's home, not the property she later purchased from the Melchers.

**4.** Davis alleges that the Melchers filed a drawing by Ruprai, their architect, that falsely depicted the then-existing structure.

INTERIOR ONLY! DEMOLITION ONLY!

. . .

No. Of stories[:] 2

Accordingly, by obtaining the building permit the Melchers did not obtain a right to construct a third story and to go beyond interior and demolition work.

Second, the application also said that no excavation was to be done, and the building permit, again, did not authorize excavation to be done. By indicating that no excavation was to be done, Frolia did not have to answer a number of questions regarding erosion control methods, drainage, and support columns. However, not being required to answer those questions did not obviate the necessity of a building permit for any excavation work. Accordingly, the "fraud" in the building permit application did not give rise to a right to excavate: the excavation was undertaken without a building permit authorizing the excavation, and once the excavation took place, the "fraud" was not the cause of the failure to proceed with a proper building permit and the failure to use proper excavation methods that would have avoided harm to Davis' property.

Third, the Melchers also failed to disclose that the construction would extend beyond the existing building wall. When that type of construction is done, a wall check survey is required.[5] Obtaining building permits that did not authorize a projection beyond the existing building line did not shield the Melchers from that requirement, and, accordingly, the court re-

**5.** Such a wall examination is required by District of Columbia law after the foundation walls are in place and before construction occurs above ground. Complaint ¶ 44.

jects as a matter of law Davis' allegation (Complaint ¶ 41) that the Melchers avoided a wall check survey by falsely and fraudulently representing that they were not going to build beyond the existing building line. The "fraud" in the building permit did not authorize a wall extension without a wall examination, as the building permit only authorized interior and demolition work. (Nor did subsequent building permits authorize the wall extension.) Moreover, the requirement of a wall examination is not triggered by the building permit itself, but because District of Columbia law requires an owner to obtain a wall examination to assure that there is no encroachment beyond authorized limits whenever a building wall is extended. The complaint alleges that:

> Had the Melchers informed the Department of Public Works that their addition would extend beyond the then, existing building wall, the District would have required the Melchers to obtain a wall check survey, to be certain that the new addition was properly located on the Melcher's [sic] property. **See Exhibit 4.**

Exhibit 4, the Office of the Surveyor's Wall Examination Instruction Sheet, makes clear that a wall survey occurs if the builder or property owner submits an application for a wall examination to be performed pursuant to the requirements of the D.C. Building Code to determine wall locations. Even if Frolia had disclosed the existence of a wall extension, and the building permit had authorized a wall extension, only by applying for a wall examination would one have occurred. The constructing of a wall extension without a building permit authorizing such, and the failure to request a wall examination, not the "fraud" in the application for a building permit, were the cause of the wall being extended without a wall examination.

Fourth, the application listed "EF Works" (Frolia's company) as the building contractor, and under "Lic. No." listed "VA. A" without a license number. The complaint does not allege that Frolia's company was unlicensed in Virginia. Accordingly, the application arguably was not false in this regard. However, the court will assume for purposes of decision that Frolia implicitly falsely represented that he was licensed to do business in the jurisdiction (the District of Columbia) in which the permit was being sought.

However, nothing would have prevented the Melchers from firing Frolia for lack of a license and proceeding with a new contractor. The cause of any harm to Davis arising from Frolia being unlicensed (and hence from his maybe being not a competent builder) arose from the Melchers' continuing to utilize Frolia's services even though he was unlicensed, not from the issuance of the building permit.

2.

On November 24, 1999, Frolia submitted a second application for a building permit. In addition to the misrepresentations made in the first application, this application falsely states that the **existing** number of stories on the house is "3." The building permit set 3 stories as a condition of authorized work, but did not authorize a basement. As will be seen, that falsehood was not the proximate cause of harm to Davis. (A later permit, which disclosed the true number of existing floors, authorized the construction of three stories; and the damage that Davis suffered did not arise from the inclusion of a third story but from negligent performance of the foundation and adjoining wall work, and from the encroachment in the Melchers' projection of their existing building line.)

The application also failed to disclose that an addition was being added whose construction was already underway, and

the permit did not authorize the addition. However, Davis has failed to allege any facts showing that this falsehood led to any damage to her. Building the addition without a building permit may have resulted in damage to her, but that did not flow from the falsehood.

The application also listed a license number for EF Works as the contractor, but this was presumably EF Works' Virginia license number. The complaint views the application as falsely representing the number as a District of Columbia license number, and the court will accept that characterization for purposes of decision. As in the case of the first building permit, this false representation did not directly lead to harm to Davis' property, whereas the Melchers' continued employment of Frolia did.

On January 27, 2000, the District of Columbia issued a Stop Work Order, revoking the existing building permit, and finding that the Melchers made false statements/misrepresentations in their permit applications.

### 3.

On February 15, 2000, Frolia submitted a third application for building permit. The application disclosed that the existing structure was two stories and indicated that the proposed dwelling had three stories and a "cellar." Davis alleges this was false because the Melchers added a full-height basement. However, attached to the application was an engineering drawing referring to the below-ground space as a "basement" and showing the basement's height. The application again indicated that the earth would not be disturbed, and did not disclose that the building line would extend beyond the existing building line. Additionally, the application listed Glenn Melcher as the building contractor, listing Frolia only as an agent for the owner in seeking the application (rather than as a contractor) in order to conceal that Frolia did not have a license. Again, however, any harm to Davis arising from the employment of Frolia arose not from the Melchers' obtaining the building permit but from the Melchers' continued use of Frolia after obtaining the building permit.

On September 5, 2000, the District issued another Stop Work Order and a $500 fine for roof work not authorized by any building permit. On October 25, 2000, the District issued a $500 fine and Notice of Infraction for "rooftop alteration & windows or 3rd floor addition being constructed without a permit." (The word "or" in this quoted language probably was meant to be "on" as the third floor addition was being constructed with a permit.) On October 22, 2001, the District issued a $1000 fine for a "recidivist violation" referencing the October 25, 2000 infraction and reciting the nature of the infraction as being "rooftop alteration & 3rd floor windows."

### B.

Davis alleges that the Melchers' construction encroached on her property and undermined the common wall that her property shares with the Melchers' property, and that the construction of the Melchers' property caused it to include unsafe conditions that threaten her property. She hired a structural engineer who advised her that it was unsafe to remain in her property; Davis thus incurred moving expenses and living expenses. Davis also alleges that she has incurred over $260,000 in expenses to stabilize and repair the shared property.

### C.

The following facts (supported by affidavits of the Melchers and Frolia) are established by the Melchers' statement of mate-

rial facts as to which there is no genuine dispute, and Davis' response thereto.

**1. The Melchers were unaware when they hired Eric Frolia and throughout the renovation of their home that Frolia was not a licensed contractor in the District of Columbia.**[6] Davis does not specifically deny this fact, stating instead that:

> the Melchers, at a minimum, **should have been aware** that Frolia was not a licensed contractor in the District. Glenn Melcher ... was quite familiar with District licensing requirements and could have easily found out that Frolia was not properly licensed, particularly since he was required to provide Frolia's license under the terms of his federal HUD loan. [Emphasis added.]

Davis Memorandum at p. 43. Negligence or recklessness in not verifying that Frolia had a license does not equate with knowledge that Frolia had no license. Although negligence or recklessness may suffice to show that the Melchers should have been aware of the false misrepresentations for purposes of Davis asserting a claim under nonbankruptcy law, that does not establish that the Melchers **knew** that misrepresentations were made. Once the Melchers supplied affidavits establishing that they did not know that Frolia was unlicensed, the burden shifted to Davis under F.R. Civ. P. 56(e) to supply affidavits or other evidence "set[ting] forth **specific facts** showing that there is a genuine issue for trial." [Emphasis added.] Davis has supplied abundant evidence that Glenn Melcher was sophisticated in renovating properties and in dealing with the District of Columbia. However, even viewing that evidence in the light most favorable to Davis, it does not rise to the level of making Melcher's denial (that he had knowledge that Frolia was unlicensed) implausible, such as to present an issue that should be left for the factfinder at trial. Because Melcher's denial of knowledge has not been shown to be implausible, it is not enough for Davis to hope that Melcher's demeanor at trial might persuade the court that he was lying. *See United States v. Zeigler,* 994 F.2d 845, 849 (D.C.Cir.1993) (jury verdict may not be sustained solely on inferences to be drawn from a witness's demeanor in making a denial as opposed to those drawn from the witness's facially inconsistent or implausible testimony), *following Dyer v. MacDougall,* 201 F.2d 265 (2d Cir.1952) (applying rule in summary judgment context). *See also Modern Home Institute, Inc. v. Hartford Acc. & Indem. Co.,* 513 F.2d 102 (2d Cir.1975) (a hope of discrediting the defendant's denials at trial does not present a material issue of fact for summary judgment purposes). Moreover, Davis bears the burden of proof at trial, and has failed to present any evidence that would support a finding that the Melchers actually knew that Frolia was unlicensed. "[S]ummary judgment cannot be defeated by the vague hope that something may turn up at trial." *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) (citation omitted). *Accord, E.P. Hinkel & Co. v. Manhattan Co.,* 506 F.2d 201, 205 (D.C.Cir.1974).

**2. The Melchers' contract with Frolia required him to obtain all licenses and permits necessary to do the work required under the contract.**

**3. Frolia obtained all the permits for the renovations of the property.**

**4. The Melchers did not fill out or ever see the applications for permits for the renovations of their home.**[7]

---

**6.** This is established by both the Melchers' and Frolia's affidavits.

**7.** Davis responds that the Melchers were not absolved of ensuring that Frolia's applications

**5. The Melchers never intended to cause any harm to Davis or her property.**[8]

**6. The Melchers did not perform any of the actual renovation or construction work on their home.**[9] Davis' affidavit points to Glenn Melcher's having monitored Frolia's work, but that is insufficient that Melcher himself performed any of the actual work.

■ Davis' affidavit mentions four incidents suggesting she is attempting a new theory, not previously pled, for her § 523(a)(6) claim. Specifically, the complaint did not allege that the Melchers instructed Frolia to conduct the construction in an improper way, knowing that such improper construction might cause the damage that Davis' property suffered. Instead, the complaint rested both its § 523(a)(2)(A) and § 523(a)(6) theories on the Melchers' having procured building permits by fraud. Davis' affidavit now suggests a slightly different theory that the Melchers may have directed the work to be performed in a way damaging Davis' property.

First, Davis' affidavit asserts that Glenn Melcher told her when he settled on the purchase of his property, "that he planned to take four inches from my yard because he claimed his yard was missing four inches." That does not rise to the level of alleging that Melcher instructed Frolia to go over the Melchers' property line into Davis' property when Frolia performed construction that entailed a projection beyond the Melchers' existing building.

Second, Davis' affidavit also points to Glenn Melcher's instructing his workers not to fix cracks that the construction caused to Davis' property. However, a failure to correct existing damage is not the same thing as intentionally causing damage in the first place.

Third, Davis' affidavit recites that "neither the Melchers nor their contractor apologized when my footer was cut off, instead indicating that it was deliberate." This fails clearly to allege that the Melchers (as opposed to Frolia) indicated that the act was deliberate; moreover, even if the Melchers said it was a deliberate act, they may have been referring to a deliberate act by Frolia. In any event, without having amended the complaint to specifically allege that the Melchers deliberately decided to cut off Davis' footer, the issue is not before the court.

Fourth, Davis' affidavit alleges that Glenn Melcher deviated from the engineer's plans that were part of the building permit applications by opting to use poured concrete in lieu of concrete blocks held together with mortar and reinforced with steel rods, and with piping for drainage. The complaint makes no mention of these facts as a basis for § 523(a)(6) relief, and in any event Davis has not alleged that

were not fraudulent and untruthful, but she does not contend that the Melchers ever actually learned that the applications were fraudulent and untruthful. Again, recklessness in not supervising Frolia to make sure he did not submit false applications does not equate to knowledge that the applications were false.

8. Davis contends that this is irrelevant because Davis was in the class of persons likely to be harmed by the fraudulent misrepresentations in the applications for permits and

licenses. However, Davis has not contradicted the Melchers' lack of knowledge of the misrepresentations, and without such knowledge, the applications can be no basis for finding an intention to injure Davis.

9. Davis responds, again, that the Melchers were not absolved of ensuring that Frolia's applications for the permits were not fraudulent and untruthful.

Melcher knew that the change was substantially certain to cause damage to her property.

Davis' affidavit similarly hints at a new basis, not pled in the complaint, for § 523(a)(2)(A) relief. She states that Glenn Melcher persuaded her to consent in writing to a party wall (instead of leaving a three-foot wall of dirt between the excavation pit as would ordinarily be required by District of Columbia law absent consent to a party wall) by representing that building up against his house would benefit her by making her house stronger, and providing a footer for her at no cost, which would save her money if she later decided to build an addition. (Her consent to the party wall was part of the third application for a building permit.) She claims, in a conclusory fashion, that these were fraudulent representations, without explaining why they were fraudulent. She only vaguely suggests that because the Melchers' construction work eventually did not include space for her house's footer, and because her house's foundation was ultimately weakened, not strengthened, that there was something fraudulent, but she falls short of alleging knowledge on the part of the Melchers that the representations were false when made. In any event, without Davis having sought to amend her complaint, these assertions are not properly before the court as part of her existing § 523(a)(2)(A) claim which was premised only on the fraudulent building permit applications.

## II

In evaluating Davis' § 523(a)(2)(A) claim, the court assumes that Frolia's false statements can be imputed to the Melchers based on an agency theory. Nevertheless, the § 523(a)(2)(A) claim fails because the Melchers obtained no property from Davis and because the proximate cause of the harm to Davis was not the fraudulent procurement of building permits but failure of the Melchers' contractor, Frolia, to perform construction of the renovation in a proper manner to avoid damage to Davis. Even if Frolia's being unlicensed could be said to have led to the damage to Davis in a but-for sense, it was the Melchers' continued employment of Frolia (with lack of knowledge that Frolia was unlicensed), not the building permits, that was the direct cause of that event.

### A.

Under agency law principles of nonbankruptcy law, a principal is charged with claims for fraud arising from his agent's false misrepresentations if the agent was authorized to act on the principal's behalf, as occurred here.[10] The courts and scholars are divided on whether an agent's fraud, imputable to the principal under nonbankruptcy law, may be imputed to a debtor as the principal for purposes of § 523(a)(2)(A). Based on *Strang v. Bradner*, 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885), most courts now hold that if the debtor is liable to the creditor based on agency principles for a debt arising from property obtained by fraud, the debt es-

10. *See* Restatement (Second), Agency, § 257 ("A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal."); § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."). If the knowledge of an agent is important to an act that the agent is authorized to perform, the agent's knowledge in carrying out authorized acts is imputed to the principal. See Restatement (Second) Agency § 272 cmt. A (1958).

capes discharge.[11] Other courts hold that for § 523(a)(2)(A) to apply, the debtor must have known or should have known of his agent's fraud,[12] or that the agent's intent to deceive cannot be imputed to an innocent debtor.[13] The court assumes, without deciding, that any fraud by Frolia could be imputed to the Melchers.[14]

### B.

■ The Melchers argue that they did not obtain money, property, or services from Davis and therefore, Davis fails to state a claim under § 523(a)(2)(A). Davis contends that the Melchers obtained a fully renovated townhouse by their use of fraudulent applications for building permits. As recognized in *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), "Once it is established that specific money or property has been obtained by fraud ... 'any debt' arising therefrom is excepted from discharge." Once specific property obtained by fraud is identified, the debt that is nondischarge-able under § 523(a)(2)(A) includes not just the value of the property, but all liability based on obtaining property by fraud (including punitive damages, attorney's fees, and other compensatory damages based on the property having been obtained by fraud). However, the point that must be emphasized is that the debt must arise from the obtaining of some property by fraud.

The Melchers always owned their home, and they paid for all of the renovations. The renovated home was not obtained from Davis or anyone else. Davis's loss arose from the negligently performed work incident to the renovation, not from the Melchers' obtaining property from her. The Melchers' renovated home did not include any property obtained by fraud. Accordingly, the court must reject Davis' argument.

■ Davis could argue (although she failed to do so) that the building permits themselves were property obtained by

---

**11.** *See, e.g., Deodati v. M.M. Winkler & Assoc. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 749 (5th Cir.2001); *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1561 (6th Cir.1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); *In re Tsurukawa*, 287 B.R. 515, 524–25 (9th Cir. BAP 2002); *In re Hosking*, 89 B.R. 971, 977 (Bankr.S.D.Fla.1988). *See also Hoffend v. Villa (In re Villa)*, 261 F.3d 1148 (11th Cir.2001), *cert. denied*, 535 U.S. 1112, 122 S.Ct. 2328, 153 L.Ed.2d 159 (2002) (viewing *Strang* as having imputed liability for fraud under the predecessor to § 523(a)(2)(A) based on the common law of partnership and agency) (dicta); Lawrence Poneroff, *Vicarious Thrills: The Case for Application of Agency Rules in Bankruptcy Dischargeability Litigation*, 70 Tul. L.Rev. 2515 (1996). *Cf. Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440, 1441 (9th Cir.1986) (innocent's partner's imputed liability held nondischargeable under § 523(a)(6)).

**12.** *See Walker v. Citizens State Bank (In re Walker)*, 726 F.2d 452, 454 (8th Cir.1984); *Pisano v. Verdon (In re Verdon)*, 95 B.R. 877, 882 (Bankr.N.D.N.Y.1989).

**13.** *See, e.g., Alden State Bank v. Anderson (In re Anderson)*, 29 B.R. 184, 191 (Bankr. N.D.Iowa 1983). *See also* Theresa J. Pulley Radwan, *Determining Congressional Intent Regarding Dischargeability of Imputed Fraud Debts in Bankruptcy*, 54 Mercer L.Rev. 987 (2003).

**14.** The court thus bypasses the question of whether the Melchers, who were arguably the principal intended beneficiaries of the requirement of District of Columbia law that Frolia undertake construction only if he was licensed, and who were defrauded by Frolia in that regard, can nevertheless have Frolia's false representation on the applications that he was licensed imputed to them as Frolia's principal under agency principles. Had the Melchers submitted the applications themselves, and innocently represented that Frolia was licensed, they could hardly be charged with fraud.

fraud. However, the building permits were not Davis's. Moreover, building permits are in the nature of a grant of government permission to engage in certain conduct; the obtaining of the license is approval by the government to proceed, not a conveyance from the government of some property interest owned by the government. In other words, until the permits were issued to allow the construction, they did not exist as property owned by anyone. Only once they were received by the Melchers were the permits property belonging to someone. *See 3883 Connecticut LLC v. District of Columbia,* 336 F.3d 1068 (D.C.Cir.2003). Accordingly, the permits were not property of someone else obtained by the Melchers by fraud.

It is difficult readily to accept that Congress intended the fraud exception of § 523(a)(2)(A) to apply to a claim for damage from construction arising from the issuance of a building permit that did not immunize the owner from obligations to comply with the locality's building code. In the owner's hands, the permit may be property (because it cost money to be obtained, and it may be transferable). However, as against neighbors it does not confer a property interest altering their rights. The building permits here were only a green light to proceed with construction in accordance with the District of Columbia's building code; they did not confer a right to violate the building code or to perform construction in a negligent fashion (and violations of the building code

and negligent construction were the cause of Davis's damage).

Nevertheless, there are theoretically cases in which obtaining the issuance of a permit or license possibly ought to give rise to a claim for property obtained by fraud.[15] If that is the case, the proper focus in determining whether a permit's acquisition perpetrated a fraud is to examine what the permit allowed to be accomplished and to ask whether the harm to the creditor proximately arose therefrom. The court turns to that next.

The court will thus bypass the issue of whether the property at issue must have been owned by someone else before the debtor was granted the property in order for § 523(a)(2)(A) to apply.

### III

In obtaining the permits, the Melchers did not obtain a property right to damage and encroach upon Davis' property, or immunity of Frolia from any contractor licensing requirements. For these fundamental reasons, the obtaining of the permits did not proximately cause the harm to Davis; instead, the harm proximately arose from Frolia's continued work as an unlicensed contractor (a fact of which the Melchers were ignorant) and his negligent performance of the work. Moreover, Davis has not alleged, nor could she establish, justifiable reliance on the building permits as an ongoing representation

---

**15.** If a permit conferred an **irrevocable** exception to ordinary building restrictions, and the permit was procured by fraud, the court could more readily view the permit as property obtained by fraud. For example, if such a permit allowed a 50–story building (when the ordinary restrictions would allow only a three-story building), the harm to neighbors would be obvious. They would be stuck with a neighboring monstrosity that could not be set aside because the permit was irrevocable.

*Cf. In re Orthopedic Bone Screw Products Litigation,* 159 F.3d 817 (3d Cir.1998) (orthopedic patient had right to proceed against the manufacturer of a defective medical device based upon a "fraud on the FDA," when the manufacturer had obtained FDA approval for the device by submitting fraudulent information), *rev'd on other grounds sub nom. Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

to her that whoever performed the work was licensed.

### A.

Only debts proximately arising from the obtaining of property by fraud are nondischargeable under § 523(a)(2)(A). *United States v. Spicer,* 57 F.3d 1152, 1157 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996). It is not enough to show that false representations were made; Davis must also show that her damage flowed directly from the misrepresentations. *McCrory v. Spigel (In re Spigel),* 260 F.3d 27 (1st Cir.2001). Even if § 523(a)(2)(A) is construed as applying to acquiring a license by fraud, only debts proximately arising from the procuring of that license by fraud are excepted from discharge. Accordingly, any fine owed the District for obtaining the building permits by fraud arguably would be nondischargeable. However, the damage claims that Davis asserts are only remotely related to the false representations that Frolia made in the applications for the building permits. The damage arose from the Melchers' continued employment of Frolia (who they did not know was unlicensed) and from Frolia's making the renovations in a negligent fashion, and did not proximately arise from the procuring of the permits by fraud.

As the court of appeals observed in *Spicer,* 57 F.3d at 1157:

> Proximate causation—loss or damage to the creditor "as a proximate result of" the debtor's misrepresentation—is an element that must be proved in order to establish nondischargeability under § 523(a)(2)(A). [Citations omitted.]

And in general, the causation element in fraud cases demands more than mere "but-for" causation. *See Greenberg v. de Tessieres,* 902 F.2d 1002, 1004 (D.C.Cir. 1990) ("but-for" causation is not sufficient to establish common law fraud); *In re Hibbs,* 568 F.2d 347 (3d Cir.1977) ("but-for" causation is not sufficient to establish claim under False Claims Act); Restatement (Second) of Torts § 548A (1977) (to establish fraud, fraudulent act must be a "substantial cause" of victim's loss).

*See also Archer v. Warner,* 538 U.S. 314, 325–26, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (Thomas, J., joined by Stevens, J., dissenting) (for § 523(a)(2)(A) to apply, the creditor's loss must be proximately traceable to the fraudulent act, and superseding independent causes can sever any causal nexus even if there was some remote connection between the injury and the loss).[16] As *Spicer* and subsequent decisions, including *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), make clear, it is appropriate to look to the Restatement (Second) of Torts (1976) (cited hereinafter as "Restatement") in determining what proximate cause entails. Proximate cause requires both causation in fact (but-for causation) and legal causation. *See, e.g., Shaw v. Santos (In re Santos),* 304 B.R. 639, 669–70 (Bankr.D.N.J.2004):

> "If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction.... [T]he plaintiff must have relied upon the misrepresentation in incurring the loss." RESTATEMENT § 546 cmt. a and b. Causation in · fact can be established

---

16. The majority decision in *Archer* did not disagree with the dissent's recitation of the proximate causation requirement, and instead found that the parties' settlement agreement (regarding a debt that had arisen from fraud) had not severed the causal relationship between the liquidated debt and the underlying fraud. *Archer,* 538 U.S. at 320, 123 S.Ct. 1462.

through evidence demonstrating that the debtor's false statements induced the creditor to enter into an agreement with the debtor for his services and that the misrepresentation was a substantial factor in influencing the creditor's decision. [*Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 219 (1st Cir. BAP 2002) ].

By contrast to factual causation, "[m]isrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates.... This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow." RESTATEMENT § 548A cmt. a and b. Legal causation can be established through evidence showing that the creditor's loss could reasonably have been expected to result from its reliance on the debtor's misrepresentation. *Gem Ravioli*, 271 B.R. at 221.

As stated in *District of Columbia v. Harris*, 770 A.2d 82, 92 (D.C.2001):

Proximate cause is "that cause, which in natural and continued sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Lacy v. District of Columbia*, 424 A.2d 317, 320 (D.C.1980) (internal quotation omitted). The "defendant need not have foreseen the precise injury, nor should [he] have had notice of the particular method in which a harm would occur, if the possibility of harm was clear to the ordinary prudent eye." *Spar v. Obwoya*, 369 A.2d 173, 177 (D.C.1977) (citing *Kendall v. Gore*, 98 U.S.App. D.C. 378, 387, 236 F.2d 673, 682 (1956)).

### B.

Davis argues that the Melchers received renovations to their property at a lower cost because they did not adhere to the normal required procedures for obtaining a permit (which would have required more extensive compliance with local construction regulations). Davis argues that she suffered damages because of the Melchers' failure to adhere to the construction requirements, and thus that Davis's complaint, taken as true, is sufficient to establish that the Melchers received property by false pretenses, false representations, or actual fraud. The court disagrees.

The negligence in actually constructing the renovations, and failure to follow building code requirements, not the building permits, was the proximate cause of the damage. The building permits only granted permission to proceed with construction, and did not immunize Frolia from the requirements of complying with building code requirements and from performing the work competently.

Much of the damage of which Davis complains occurred because the Melchers undertook construction **not** authorized by their building permits (because Frolia's applications for those permits failed to disclose the extent of the work). Because the permits did not authorize such work, the damage ensuing from the performance of such work cannot be said to flow from the obtaining of the permits.

Although one permit application falsely stated that the existing structure had three stories, a later permit, which accurately listed the existing structure as having only two stories, authorized completion of three stories. Moreover, the damage of which Davis complains was not proximately caused by the failure to disclose the existence of only two stories, but by Frolia's negligent performance of construction work.

Finally, the applications all falsely represented Frolia as licensed in the District

to do construction work or hid his role as contractor. The damage to Davis' property, however, arose from the Melchers' continued employment of Frolia after issuance of the permits (in ignorance that he was not licensed), and from Frolia's negligence in performing the work. Under Davis' reasoning, any debtor's liability for negligently driving a car would be excepted from discharge if the debtor's driving license (assuming that constitutes property) was obtained by false representations (even though the negligence would have existed regardless of whether the debtor was driving with or without a license).

### C.

This case is distinguishable from cases in which a debtor fraudulently induces a creditor to enter into a contract to provide the debtor professional services based on a fraudulent representation regarding the debtor's holding the necessary professional license to provide the services. In those cases, the debtor obtained a contract by false representations that were of importance to the plaintiff's entering into the contract, and his debt for damages arising from procuring that contract rightfully are nondischargeable. *See In re Creta,* 271 B.R. 214, 220 (1st Cir. BAP 2002). *See also Lee–Benner v. Gergely (In re Gergely),* 110 F.3d 1448, 1453 (9th Cir.1997). Here, the Melchers obtained no contract or other property from Davis based on Frolia's false statements in the permit applications. The Melchers may have a fraud claim against Frolia for misrepresenting to them throughout the construction that he was a licensed contractor, but that is because Frolia obtained something

from them, a contract on which they made payments, and thus any harm to them is a direct consequence of his obtaining the contract by fraud (unless negligent performance was not a foreseeable consequence of his false representation that he was licensed).[17] In contrast, the Melchers received nothing from Davis via Frolia's fraud, and she cannot make a fraud claim against the Melchers based on Frolia's false statements made on the Melchers' behalf: the harm to Davis proximately arose not from the Melchers' obtaining building permits, but from Frolia's proceeding to violate District of Columbia law by working on the renovations without being a licensed contractor (a fact of which the Melchers were ignorant), and his negligence in performing that work.

### D.

Davis argues that she was within the class of persons who should be given protection from the Melchers' fraudulent permit applications, stating:

> A plaintiff can bring an action if the conduct of the defendant was wrongful, and if he was part of the class of persons for whom it was reasonably foreseeable that the wrongful conduct would harm. *See Restatement (2d) of Torts* §§ 310, 552.

Davis Memorandum at p. 20. She further argues that lack of privity is not a bar to recovery, citing *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 991 (D.C.1980) (termite inspection company liable to home buyer, even though false representation was made to seller), and similar decisions.

---

**17.** *See Parker v. Grant (In re Grant),* 237 B.R. 97, 119 (Bankr.E.D.Va.1999); *Kendrick v. Pleasants (In re Pleasants),* 231 B.R. 893, 898 (Bankr.E.D.Va.1999); *McCain v. Fuselier (In re Fuselier),* 211 B.R. 540 (Bankr.W.D.La. 1997); *McDaniel v. Border (In re McDaniel),* 181 B.R. 883 (Bankr.S.D.Tex.1994); *Peterson v. Bozzano (In re Bozzano),* 173 B.R. 990 (Bankr.M.D.N.C.1994); *Bottari v. Baiata (In re Baiata),* 12 B.R. 813, 820 (Bankr.E.D.N.Y. 1981).

However, the court does not base its decision on a lack of privity, but on the lack of proximate causation because the Melchers ought not be held legally responsible for Frolia's act of continuing to act as an unlicensed contractor (without their knowledge) after procuring the building permits. That is an intervening cause that excuses the Melchers from any responsibility for the damage that Frolia caused. The building permits did not immunize Frolia from the obligation to act as a contractor only if licensed to act as such. Davis' damage may not have been remote in the sense of a requirement of privity, but it was too remote in terms of what really caused the damage.

### E.

■■■■ Finally, justifiable reliance is generally an element of a § 523(a)(2)(A) claim based on misrepresentation. *See Field v. Mans,* 516 U.S. at 69–77, 116 S.Ct. 437. Davis has not alleged that she knew of the representations of the Melchers in the building permit applications. All she knew was that the Melchers had obtained building permits. Instead of alleging reliance, she argues that she was entitled to the protections that building permits are designed to afford the public. In contrast to *Orthopedic Bone Screw Products Litigation,* 159 F.3d at 817, where members of the public bought a defective medical device in reliance on FDA approval obtained by fraudulent misrepresentations as to the safety of the device, and could be viewed as relying on the device being safe based on the necessity of the manufacturer submitting accurate information regarding the product's safety, Davis cannot point to any reliance of that direct nature. Again, the harm to her only remotely arose from the procuring of the building permits. Stated another way, she could not justifiably rely on the building permits as an ongoing representation to her, after issuance of the permits, that whoever was performing the work was licensed.

### IV

For the Melchers' debt to Davis to be nondischargeable under § 523(a)(6), Davis must establish "willful and malicious injury by the debtor[s]" to her property. Because Davis has not established a willful injury by the Melchers to her property, the § 523(a)(6) claim must be dismissed.

### A.

■■■ In *Hamilton v. Nolan (In re Nolan),* 220 B.R. 727, 730 (Bankr.D.D.C. 1998), this court described a willful injury as a " 'deliberate or intentional injury, not merely a deliberate or intentional act which leads to injury,' " *quoting Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).[18] As the Supreme Court stated in *Geiger,* " 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury* not merely a deliberate or intentional *act* that leads to injury." 523 U.S. at 63, 118 S.Ct. 974. In applying *Geiger,* many courts find that the wilfulness prong is satisfied where the injury is **substantially certain** to result from the debtor's conduct.[19]

---

18. The court described a malicious injury as one " 'in conscious disregard of one's duties or without just cause or excuse.' " *quoting Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986). *Nolan,* 220 B.R. at 730.

19. *See Carrillo v. Su (In re Su),* 290 F.3d 1140 (9th Cir.2002) (debtor must have the subjective intent to cause injury **or** must have the subjective belief that injury is "substantially certain to result from his own conduct" to satisfy the wilful prong of § 523(a)(6)); *Williams v. Int'l Bhd. of Elec. Workers (In re Williams),* 337 F.3d 504, 509 (5th Cir.2003) (a finding of willfulness requires a subjective

Davis's complaint does not allege that the Melchers intended to injure Davis. Davis repeatedly alleges that the Melchers were "deliberately and knowingly false and fraudulent and had specific intent to deceive and defraud," but those actions do not equal an intent to injure. At most, accepting the allegations of the complaint as true (and disregarding for the moment the affidavits of record to the contrary), the Melchers were deliberately fraudulent in obtaining their construction permits (perhaps to avoid having to incur the cost and hassle of complying with statutorily mandated construction and excavation methods, and of employing a licensed building contractor), but that does not mean that they intended to injure Davis. Rather, it demonstrates an intent to circumvent the system to benefit themselves and the renovation of their home. However, nothing in the complaint establishes that the Melchers intended to injure Davis or her property. The Melchers' alleged conduct may have been reckless, but Davis has not alleged any facts demonstrating that it should have been obvious to the Melchers that injury to Davis would follow.

## B.

▇▇▇ In any event, the Melchers have established that they were not involved in submitting the applications for building permits, did not perform the construction work, and had no knowledge that Frolia was unlicensed. Even if the complaint's allegations could be viewed as alleging an intentional infliction of injury by the Melchers, those allegations have been negated for purposes of summary judgment.

## C.

▇▇▇ In contrast to § 523(a)(2)(A), an injury done by a debtor's agent, and not by the debtor, but imputed to a debtor under nonbankruptcy law, fails to satisfy § 523(a)(6) because the injury must be "by the debtor." *In re Nolan,* 220 B.R. 727, 731–32 (Bankr.D.D.C.1998). Here, the Melchers have established that they did not prepare or know of the falsity of the applications for building permits, did not perform any of the construction work, and did not know that Frolia was unlicensed. Accordingly, even if it is assumed (for purposes of analysis only)[20] that Frolia's false applications for building permits, his manner of performing work, or his being unlicensed necessarily would have led to injury to Davis, thus making the resulting injury a willful injury by him, the injury is not a willful injury by the Melchers.

---

intent to cause harm or an objective substantial certainty of harm).

**20.** Even Frolia's acting as an unlicensed contractor does not rise to the level of a willful infliction of injury as the injury was not substantially certain to arise therefrom. *See In re Romano,* 59 Fed.Appx. 709, 715 n. 6, 2003 WL 731723 *6 n. 6 (6th Cir.2003) (medical malpractice judgment debt was dischargeable, notwithstanding that nurse allegedly committed felony by practicing without a license); *Serrao v. Picanco (in re Picanco),* 2003 WL 22946440 (Bankr.D.Hawai'i 2003) (building contractor performed construction without being licensed); *In re Groff,* 301 B.R. 644 (Bankr.D.N.J.2003) (driving with a suspended license). *Cf. In re Walker,* 48 F.3d 1161 (11th Cir.1995) (a debtor's intentional failure to obtain mandatory liability insurance does not create § 523(a)(6) liability to the party injured in an accident that would have been covered by insurance); *In re Glass,* 207 B.R. 850 (Bankr.E.D.Mich.1997); *In re Fields,* 203 B.R. 401 (Bankr.M.D.La.1996). Although *Britton v. Price (In re Britton),* 950 F.2d 602, 605 (9th Cir.1991), could be read as holding that misrepresentation of a cosmetic surgeon's being licensed satisfied the willfulness requirement, the Ninth Circuit has disavowed that reading. *Gergely,* 110 F.3d at 1451. *See also McAlister v. Slosberg (In re Slosberg),* 225 B.R. 9, 18 n. 10 (Bankr.D.Me.1998) (viewing *Britton* as overruled by *Geiger* ).

V

A judgment follows dismissing this adversary proceeding.